## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

<table>
<tr>
<td>

JANE DOE, a Connecticut resident; JOHN
DOE, a Connecticut resident; and J.D., a
Connecticut resident,

               Plaintiffs,

  v.

TANYA MASTOLONI (aka Tanya Romero),
a Connecticut resident; REBECCA
KESSLER (nee Wills), a Connecticut
resident; CHRISTOPHER ESPOSITO, a
California resident; LAURA SULLIVAN, a
Connecticut resident; AVON PUBLIC
SCHOOLS, a Connecticut public school
district,

              Defendants.

</td>
<td>

3:14-CV-00718 (CSH)


**February 12, 2016**

</td>
</tr>
</table>

## RULING ON MOTION TO AMEND THE COMPLAINT AND MOTION TO DISMISS THE PROPOSED AMENDED COMPLAINT

**HAIGHT,** Senior District Judge:

Plaintiffs Jane and John Doe ("Jane" and "John"), Connecticut residents whose names have been changed to protect the identity of their minor children, claim that three Spanish teachers and a guidance counselor at Avon High School indoctrinated their three daughters into a religious cult. Plaintiffs allege that with their help, J.D., Jane's and John's youngest daughter, broke free from the indoctrination. It is further alleged that J.D.'s older sisters, E.D. and L.D., are fully indoctrinated into the cult and are estranged from the family. They are not parties to this lawsuit.

Plaintiffs Jane and John Doe, each individually and on behalf of J.D., bring this action against Avon Public Schools ("the Board"), and against the Spanish teachers, Tanya Mastoloni, Rebecca Kessler (nee Wills), Christopher Esposito, and the guidance counselor, Laura Sullivan (collectively,

the "Faculty Defendants").  The complaint asserts federal civil rights claims under 42 U.S.C. §§ 1983, 1985, and 1986, as well as claims under the Connecticut Constitution, Connecticut General Statutes and the common law.

Plaintiffs have filed a motion to amend their complaint pursuant to Fed. R. Civ. P. 15(a)(2) and a proposed amended complaint.  The Board has filed a preemptive motion to dismiss the proposed amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  This Ruling decides Plaintiffs' motion to amend the complaint and the Board's preemptive motion to dismiss it.

## I

The following facts are derived from the proposed amended complaint [Doc. 67-2].  They do not represent findings by the Court.  Well-pleaded allegations of fact are accepted as true for the purposes of this Ruling and recited so that the Court may discern the viability of the proposed claims under the governing law.

Tanya Mastoloni taught E.D., L.D., and J.D. (collectively "the Doe Daughters") Spanish at Avon High School.  Although not part of the course curriculum, Mastoloni instructed students in "religion and pseudoscience," and "to believe in superstition, magic, and a non-scientific, anti-intellectual worldview."  Doc. 67-2 at ¶ 61.[1]  Concepts like "spirituality, numerology, astrology, dreams, mysticism, looking for 'signs,' angels, symbols, 'synchronicity,' 'negativity,' 'seeking the truth,' and death" were regular topics of discussion in Mastoloni's Spanish class.  *Id.*  In one class, Mastoloni directed her students to write an essay in Spanish "about what they thought happened to them when they died."  *Id.* at ¶ 62.  Mastoloni's colleague in the Spanish Department, Kessler, also talked about death in the classroom, using "class time to tell her students about the deaths of

---

[1]  Citations in this Part are to the numbered paragraphs in the proposed amended complaint.

children." *Id.* at ¶ 63.

Mastoloni and Kessler, along with the third Spanish teacher, Esposito, were known collectively about school as "Tri-State," a reference to the fact that one was born in New York, one in New Jersey, and the other in Connecticut. *Id.* at ¶ 39. The three teachers spent much of their time with Sullivan, the school's guidance counselor. *Id.* at ¶ 40. All four were "adherents of a religious cult that promotes martyrdom and celebrates death." *Id.* at ¶ 65.

Mastoloni began recruiting E.D., the eldest Doe Daughter, into this "religious cult," *id.*, or "coven," *id.* at ¶ 268, when Kessler, E.D.'s freshman year Spanish teacher, introduced E.D. to Mastoloni in the faculty lounge, *id.* at ¶ 76. Their relationship intensified when Mastoloni became E.D.'s Spanish teacher in her sophomore year. *Id.* at ¶ 101. Mastoloni "consistently proselytized her religious views in the classroom" and taught "E.D. and the other students to believe in superstition and magic." *Id.* at ¶ 102. Mastoloni found a particularly "impressionable" student in E.D., *id.* at ¶ 89, who while "extremely intelligent and gifted," ""lack[ed] . . . friends," was "bullied in elementary and middle school," and "related more to adults than to peers her own age," *id.* at ¶¶ 66–68.

E.D. spent a significant amount of time with Mastoloni. They ate lunch together during school hours, and communicated via email, phone and text outside of school. *Id.* at ¶¶ 107, 110. E.D. also agreed to be a teaching assistant for Mastoloni, as well as Esposito and Kessler, often staying after school to help grade papers. *Id.* at ¶¶ 83, 115. Sometimes E.D. would leave school grounds to have lunch with the three Spanish teachers. *Id.* at ¶ 92. She was even invited by Kessler to attend her children's birthday parties. *Id.* at ¶ 91. Esposito, for his part, was "inappropriately intrusive" with E.D., asking her on one occasion "about the sexual orientation of her siblings." *Id.*

at ¶ 136.

Back at home, Jane and John were troubled by what they viewed as the Spanish teachers' "lack of boundaries" and "Mastoloni's inappropriate engagement" with their daughter. *Id.* at ¶ 104. Though concerned about the nature of E.D.'s relationships with her teachers, Jane and John "were unaware that . . . Mastoloni was teaching religion in the classroom." *Id.*

Over time, E.D.'s relationship with Mastoloni turned "highly manipulative." *Id.* at ¶ 117. Mastoloni was given to "extreme mood swings," *id.* at ¶55, and "would frequently switch between two extremes," at times "showering E.D. with love and affection" and at other times, "giving her the cold shoulder." *Id.* at ¶ 118. By E.D.'s senior year, "Mastoloni's attention to E.D. became even more intense." *Id.* at ¶ 129. She professed to E.D. that E.D. was her "sole hermana." *Id.* at ¶ 109. When E.D. turned eighteen, Mastoloni promised that the two would "be friends outside of school." *Id.* at ¶ 130 (internal quotation marks omitted). In fact, "[t]he summer before E.D. began college, her relationship with . . . Mastoloni intensified" yet further. *Id.* at ¶ 138. Later, when E.D. left home to attend Wellesley College, the two continued to communicate throughout the year and met socially during school breaks. *Id.* at ¶ 163. E.D. also visited with Esposito and Kessler during college recesses. *Id.* at ¶ 164.

While away at college, E.D. began increasingly interested in religion and the occult. She "and other girls would frequently go to" a "desolate" building on Wellesley's campus called "Alumni Hall," where they would "dance, sing and perform 'whirling dervishes' — religious dances — until the wee hours of the morning." *Id.* at ¶ 173. During her junior year of college, E.D. changed her major from political science to philosophy, and "announced that she wanted to seek a masters in Divinity following graduation." *Id.* at ¶¶ 184–85. She also "told Jane and John that she wanted to

attend . . . Mastoloni's graduation from some type of school where . . . Mastoloni was receiving a degree in 'spirituality.'" *Id.* at ¶ 181. E.D.'s "sudden interest in religion" corresponded with significant changes to her personality. *Id.* at ¶¶ 186–214 She was "often irritable and emotional," *id.* at ¶ 189, had "trouble 'thinking,'" *id.* at ¶ 188, was "nervous" around her parents, *id.* at ¶ 187, and lost her sense of humor, *id.* at ¶ 197. She also started to speak, and even smell differently. E.D. was "constantly talking about 'seeking the truth' and pursuing a 'greater purpose,'" *id.* at ¶ 192, and "no longer engaged in ordinary verbal banter or back-and-forth discussion," *id.* at ¶ 194. Her mother began "to notice a very odd and pungent odor coming from [her] room," *id.* at ¶ 198, that was also "enmeshed in . . . her clothes," *id.* at ¶ 199. As E.D. underwent all of these changes, she grew apart from her family, all the while maintaining her friendship with Mastoloni, Kessler, Esposito and Sullivan. *Id.* at ¶¶ 210–14.

With E.D. away at college, Mastoloni began focusing her attention on L.D., who was a student in Mastoloni's advanced Spanish class during her senior year of high school. *Id.* at ¶ 215. In keeping with past practice, Mastoloni continued to "proselytize[] her religious views" and to teach students to "believe in superstition and magic." *Id.* at ¶ 216. She also began indoctrinating L.D. into her religion. *Id.* at ¶ 225. At the same time, Sullivan urged L.D. to attend Wellesley College after graduation so that the Faculty Defendants would have an easier time keeping the sisters indoctrinated. *Id.* at ¶ 228. L.D. decided to attend Wellesley, where she grew closer to E.D. and more isolated from the rest of the family. *Id.* at ¶¶ 229–30. She "developed a fascination with dreams, astrology, and 'symbols,'" *id.* at ¶ 233, and continued to stay in touch with Mastoloni who would visit the sisters at college, *id.* at ¶ 237. L.D. ultimately became "fully indoctrinated" into the religion of the Faculty Defendants and "began to engage in fantasies of martyrdom and suicidal

ideation." *Id.* at ¶ 262.

In the spring semester of 2013, Mastoloni tried to recruit J.D. into her "coven." *Id.* at ¶ 268. Mastoloni continued to "preach her religious ideas" in the classroom and directed a great deal of "negative attention towards J.D. in an effort to break her down psychologically." *Id.* at ¶ 269. She was "relentless in her chiding of J.D.," *id.* at ¶ 271, once "admonish[ing] her for getting a "C" on a test" in front of the class, *id.* at ¶ 270, and on another occasion, forcing her to sing in front of the class, *id.* at ¶ 279. Mastoloni also frequently "discussed J.D.'s academic performance with E.D." *Id.* at ¶ 281. For instance, she told E.D. that J.D. received a "C" on an assignment and also showed E.D. an essay J.D. wrote about her "New Year's Resolutions." *Id.* at ¶¶ 282–84.

As part of J.D.'s indoctrination, Mastoloni urged E.D. and L.D. to invite J.D. to Wellesley during J.D.'s April recess. *Id.* at ¶ 288. When J.D. returned from that visit, her parents noticed that her personality had changed. "[S]he was cold, lacked affect, and was behaving just like E.D. and L.D." *Id.* at ¶ 305. She was no longer "gregarious" or "joking," *id.* at ¶ 308, and avoided talking to her parents. Her "bizarre behavior" continued for months. *Id.* at ¶ 323.

Finally, "[a]fter much time crying and pleading and talking, Jane was finally able to break through to J.D." *Id.* at ¶ 332. "Jane saw J.D. experience a sudden psychological release," *id.* at ¶ 333, and at that moment "knew that J.D. had snapped out of the indoctrination," *id.* at ¶ 334. Jane and John later learned that throughout J.D.'s visit to Wellesley, J.D. "was under the total and constant control of . . . E.D., who was acting at the direction of . . . Mastoloni." *Id.* at ¶ 338. Mastoloni had "orchestrated" the "ordeal" in order to further J.D.'s indoctrination. *Id.* at ¶ 349.

The Faculty Defendants retaliated against J.D. when she broke free from the indoctrination. *Id.* at ¶ 403. Sullivan, for example, refused to write a recommendation letter to colleges on J.D.'s

behalf, even though a recommendation letter from a guidance counselor is a college application requirement. *Id.* at ¶ 412. Sullivan also "failed in her duties by not apprising J.D. of benchmark obligations throughout the college application process." *Id.* at ¶ 411. "When J.D. asked . . . Sullivan to let her drop Spanish from her schedule . . . Sullivan responded by trying to persuade J.D. to take Spanish with . . . Kessler" notwithstanding the role Kessler played in the indoctrination of J.D.'s older sisters. *Id.* at ¶ 407. When J.D. asked to drop another course, Sullivan "insisted that J.D. stop by her office to discuss the matter, even though such course changes are generally made electronically and do not need to be done in person." *Id.* at ¶ 408.

J.D.'s "sudden deconversion," prompted the Faculty Defendants to redouble their efforts to alienate E.D. and L.D. from the Doe family. *Id.* at ¶ 422. In July 2013, the Faculty Defendants "hatched a plan for E.D. and L.D. to move out of the Doe house for good." *Id.* at ¶ 376. In order to make them eligible for summer housing at Wellesley, the Faculty Defendants "sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless." *Id.* at ¶ 392. On July 12, 2013, Mastoloni picked up E.D. and L.D. from the Doe home. The sisters stayed at Mastoloni's residence for the next two and a half days until their living quarters at Wellesley were ready. *Id.* at ¶¶ 378, 380, 384.

During this time period, the Faculty Defendants were either at Mastoloni's residence with E.D. or L.D., or knew that E.D. and L.D. were staying with Mastoloni and concealed their whereabouts from Jane and John. *Id.* at ¶ 381-82. As of the filing of the proposed amended complaint, the Faculty Defendants were either supporting E.D. and L.D. financially or knew who was providing them with financial support. *Id.* at ¶ 399.

7

Since their removal from the Doe home by the Faculty Defendants, E.D. and L.D. have cut of all communication with Jane, John, J.D., and other friends and relatives, and have had almost no contact with their family since July 12, 2013. *Id.* at ¶ 400–01. "On August 4, 2013, E.D. sent Jane an email asking her parents to 'let her and L.D. go.'" *Id.* at ¶ 402 (internal quotation marks added).

Jane and John, each individually and on J.D.'s behalf, commenced this action against the Faculty Defendants and the Avon School Board the following spring. The initial complaint was filed on May 19, 2014 [Doc. 1]. Among other theories of liability, Plaintiffs allege that the Board violated their federal and state constitutional rights by indoctrinating the Doe Daughters and breaking up the Doe family.

## II

The Board directs its motion to dismiss at Plaintiffs' proposed amended complaint (hereinafter "PAC"). Rule 15(a)(2) provides that Plaintiffs must obtain leave of Court to file this amended pleading. If a proposed amended complaint could not survive a motion to dismiss, the Court will deny leave to file the pleading, since to do otherwise would be futile. The Board's present motion invokes that principle.

The Supreme Court has laid down in two cases guidelines to determine whether the factual allegations of a complaint are sufficient in content and form to survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Those cases are *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 566 U.S. at 678 (quoting *Twombly*, 550

U.S. at 570).  This pleading standard creates a "two-pronged approach," based on "[t]wo working principles." *Iqbal*, 556 U.S. at 678–79.

First, although a complaint need not include detailed factual allegations, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  This "facial plausibility" prong requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Importantly, the complaint must demonstrate "more that a sheer possibility that a defendant has acted unlawfully." *Id.* "[W[here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]' – 'that the pleader  is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." *Id.*[2]

<h1 style="text-align:center">III</h1>

## A.  <u>Standing to Sue on J.D.'s Behalf</u>

A preliminary question arises as to whether Jane and John Doe have standing to sue on J.D.'s behalf.  As stated *supra*, Jane and John Doe filed this action both individually and on behalf of their daughter, J.D., a minor at the time the PAC was filed.  Rule 17(c) of the Federal Rules of Civil Procedures provides for representation of a minor by representatives such as a general guardian or parent. Although a minor at the time the proposed amended complaint was filed, J.D. has now reached the age of majority.  Doc. [107]; *see* Conn. Gen. Stat. § 1-1d (stating that "the terms 'minor', 'infant' and 'infancy' shall . . . refer to a person under the age of eighteen years . . .").  Consequently her parents no longer have standing to sue on her behalf.  *See Mulready v. Mulready*, No. CIV 306 cv 00934 (AWT), 2007 WL 1791120, at *1 (D. Conn. June 16, 2007) (parents did not have standing to bring suit on behalf of adult child); *accord Schuppin v. Unification Church*, 435 F. Supp. 603, 606 (D. Vt. 1997).  In the interest of judicial economy, and because there is a possibility that J.D. would join the lawsuit if given the opportunity, the Court will analyze the PAC as if J.D. filed it on her own behalf.

If the Court concludes that J.D. could state a cognizable cause of action, the Court would consider a motion by J.D. for leave to file an amended complaint allowing her to appear as a party plaintiff in this case.  It should be noted that such a motion would be made only if J.D., in the

---

[2] The foregoing summary of the *Twombly/Iqbal* pleading standards is adopted from the Second Circuit's opinion in *Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical Centers  Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 717-718 (2d Cir. 2013).

exercise of that majority of age she has now attained, decides that she wishes to become a plaintiff.

**B.     Statute of Limitations**

The Board challenges many of the counts in the PAC on statute of limitations grounds. A defendant may raise the statute of limitations in a Rule 12(b)(6) motion "[w]here the dates in a complaint show that action is barred by a statute of limitations." *Ghartey v. St. John's Queens Hops.*, 869 F.2d 160, 162 (2d Cir. 1989).[3] "In the absence of a limitations period prescribed by statute, federal courts typically borrow the local state statute of limitations." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 (2d Cir. 2014). Furthermore, "[t]he borrowing of a state-law statute of limitations carries with it the borrowing of the state's coordinating tolling rules." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F.Supp.2d 317, 333 (E.D.N.Y. 2012) (*quoting Bd. of Regents v. Tomanio*, 446 U.S. 478, 484 (1987)). However, this applies only where the rules "are not inconsistent with the letter and purpose of the relevant provisions of federal law." *Twersky v. Yeshiva University*, 993 F.Supp.2d 429, 437 (S.D.N.Y. 2014). Finally, even where the limitations period and the applicable tolling rules are taken from state law, "federal common law determines the date on which that federal claim accrues." *Id.* at 438.

The "standard rule" for accrual of federal claims is that a "claim accrues when the plaintiff has a complete and present cause of action." *Singleton v. Clash*, 951 F.Supp.2d 578, 585 (S.D.N.Y. 2014) (*quoting Gabelli v. SEC*, 133 S.Ct. 1216, 1220 (2013)). The standard rule promotes "the basic

---

[3] The Board further challenges the state tort claims brought in the PAC. The PAC's intentional tort claims are governed by Conn. Gen. Stat. § 52-577, which provides for a three year statute of limitations period. The PAC's defamation and negligence based claims are governed by Conn. Gen. Stats. §§ 52-597 and 52-584, respectively, which prescribe a two year limitations period. However, because these claims are dismissed *infra*, some with leave to refile in state court, the Court need not decide whether these claims survive the statute of limitations.

policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Gabelli,* 133 S.Ct. at 1221. 1216, 1220 (2013) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Plaintiffs in this case seek to apply an exception to the standard rule, known as the discovery rule. *See Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferber Corp. Of Cal.,* 522 U.S. 192, 201 (1997)) (the discovery rule is "an exception to the general limitations rule that a cause of action accrues once a plaintiff has a 'complete and present cause of action'"). Under the discovery rule, "accrual is delayed until the plaintiff has discovered his cause of action." *Gabelli*, 133 S.Ct. at 1220. Under this rule, the statute of limitations begins to run when the plaintiff discovers or should have discovered the injury. *Singleton*, 951 F.Supp.2d at 587.

The Second Circuit has applied the discovery rule in § 1983 cases. *See, e.g. Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1980); *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980). In *Pinaud v. County of Suffolk*, the Second Circuit, in considering a delayed accrual theory for a statute of limitations regarding a § 1983 claim, noted that "[w]here no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury, the cause of action may not accrue until the wrong becomes apparent." 52 F.3d at 1157 (quoting *Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980)). *Pinaud* also involved liability for a municipal government under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). *Id.* The Second Circuit in *Pinaud* also said that where the injury is known, but the policy or custom of the municipality that caused the harm is not known, the statute of limitations does not begin to run until it is "clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom.'" *Pinaud*, 52 F.3d at 1157.

The Board argues that, to the extent Plaintiffs have standing to assert claims relating to E.D.'s indoctrination and alienation from her family members under § 1983 and § 1986, such claims are untimely because they accrued when E.D. graduated from high school, which was about four years before the complaint was filed.  In addition, the Board argues that the § 1986 claims arising from L.D.'s indoctrination and familial alienation are also untimely because those claims also accrued when L.D. graduated from high school, which was about two years before the complaint was filed. The Board states that any claims against it accrued in relation to the two older daughters at their graduation.

One of Plaintiffs' principal claims is that "as a direct and proximate result of the actions" of Mastolani, Kessler, Esposito and Sullivan," the "intimate relationship" between Jane and John (as parents) and E.D. and L.D. (their daughters) "was terminated."  PAC ¶¶ 595–598.  The cause of those terminations of family relationships, on Plaintiffs' theory of the case, was the Faculty Defendants' wrongful indoctrination of the two older Doe daughters into the cult.  Plaintiffs argue that these claims did not accrue until for the purposes of their federal claims until "their third daughter, J.D., broke free from indoctrination in June, 2013" because Plaintiffs did not know of the indoctrination before then.  PAC ¶ 358 alleges: "It was not until J.D. broke free that Jane and John understood that their three daughters had been subjected to religious indoctrination at Avon High School."  Further, the Plaintiffs argued in oral argument that the deprivation of the intimate relationships with E.D. and L.D. only arose in July 2013 when the two eldest daughters left the house and cut off contact with their family. Doc. 123, p. 37. The original complaint was filed on May 19, 2014, less than one year after Plaintiffs allege that they discovered the injury.

From what the Court can discern from the PAC, Plaintiffs allege that they were aware of one

of the policies or customs before the occurrence of the alleged injury of relationship deprivation, and one thereafter.   The PAC alleges that the Board adopted a policy or custom of deliberate indifference towards the constitutional rights of students and parents that directly and proximately caused Plaintiffs' injuries.   The PAC further alleges elaborates that this Board policy or custom of deliberate indifference was apparent in two principal areas: the Board's response to complaints from parents, and its failure to fund policies and training programs that would have prevented the Faculty Defendants' unlawful conduct. It appears from the PAC that the Plaintiffs were aware of the policy or custom of deliberate indifference to the complaints of parents before the injury accrued, but it does not state when Plaintiffs became aware of the failure to fund policies and training programs.[4] Doc 67-2, ¶¶ 441-444. Either way, whether the Plaintiffs became aware of the failure to fund policies and training programs before or after they became aware of the injury, the earliest that the claim could have accrued was the date of the injury these parents allege: the wrongful termination of their intimate relationships with their two older daughters.   Plaintiffs sufficiently allege that this partiular injury occurred within one year of the filing of the original complaint. Even though E.D. and L.D. graduated four and two years prior to the filing of the original complaint, thus ending any relationship between the Board and the two daughters, the date of the injury is the relevant metric in this case. Thus, the Plaintiffs' claims are sufficiently pled to survive the motion to dismiss on the

---

[4] Here, as in *Healthcare Strategies Inc. v. ING Life Ins. & Annuity Co.*,"the Complaint does not allege sufficient facts to determine whether any or all of the claims are time-barred, nor does it allege facts showing that any or all of the claims are time-barred. Where, as here, a complaint does not demonstrate facial infirmity with respect to the statute of limitations, a motion to dismiss on this ground must fail." 2012 WL 162361, at *3 (D. Conn. Jan. 19, 2012). Because there are no exact dates, the Court "may not [grant the motion to dismiss] simply because a complaint failed to include allegations affirmatively establishing its timeliness." *Slainte Investments Ltd. Partnership v. Jeffrey*, 2015 WL 6692242 at *10 (D. Conn., Nov. 3, 2015).

statute of limitations grounds.

This inquiry into the statute of limitations is necessarily a mixed question of law and fact. While the allegations in the PAC are sufficient to survive the Defendants' second motion to dismiss, the issues of when the Plaintiffs knew or should have known of the injuries they claim to have suffered, and when they became aware of the Board policies or customs said to have caused those injuries, pose on the present record present factual questions for a jury. Should this case go to trial, a special verdict form asking the jury to name the date on which the injuries and policies and customs were known to the Plaintiffs may be necessary to address the statute of limitations question in this case.

**C.    42 U.S.C. § 1983**

The PAC alleges that the Faculty Defendants deprived Plaintiffs' of their rights under the religion and association clauses of the First Amendment and the Equal Protection and Due Process clauses of the Fourteenth Amendment, and that the Board is liable for the Faculty Defendants' conduct under *Monell*. The Board argues that PAC does not allege cognizable federal causes of action, and that in any event, it cannot be found liable under *Monell* because Plaintiffs' injuries were not caused by the Board's official policy or custom.

Plaintiffs' federal constitutional claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). It states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in action at law, suit in equity, or other proper proceeding for

15

redress . . .

42 U.S.C. § 1983.  "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right."  *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  Although § 1983 provides a remedy against "any person" who, under color of state law, deprives another of rights protected by the Constitution, the Supreme Court held in *Monell* that Congress intended municipalities and other local government entities — including school boards — to be included among those persons to whom § 1983 applies.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) (citing *Monell*, 436 U.S., at 690); *see Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 120 (D. Conn. 1998) ("*Monell* did not exclude school boards.")*.*  The *Monell* court also held that a municipality may not be held liable unless action pursuant to "official municipal policy" or "custom" "caused a constitutional tort."  *Monell*, 436 U.S. at 691.

Plaintiffs' *Monell* claims against the Avon Board encompass two separate questions: (1) whether harm to Plaintiffs was "caused by a constitutional violation", and (2), "if so, whether the city is responsible for that violation." *Collins*, 503 U.S. at 120.  The Court therefore considers in the first instance whether the PAC states a cognizable federal constitutional cause of action against the Faculty Defendants.  If it does, the Court will consider whether the Board may be liable for the constitutional violation under *Monell*.

### 1.  Establishment Clause

Plaintiffs allege that Defendants violated their rights under the Establishment Clause of the First Amendment by subjecting the Doe Daughters to religious indoctrination in contravention of the Board's obligation to provide a secular public school education.

The Establishment Clause, which applies to the states through the Due Process Clause of the

Fourteenth Amendment, *DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 405 (2d Cir. 2001), states that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I.  A claim may be brought under the Establishment Clause to challenge "a statute or practice which touches upon religion."  *County of Allegheny v. American Civil Liberties Union, Pittsburgh Chapter*, 492 U.S. 573, 592 (1989).  In addition to children themselves, parents, who are "directly affected by the laws and practices" of a school touching upon religion, have standing to assert a cause of action under the Establishment Clause.  *School District of Abington v. Schempp*, 374 U.S. 203, 224 n.9 (1963); *accord Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1109 (2d Cir. 1992).

The general test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1991), as modified by *Agostini v. Felton*, 521 U.S. 203, 232 (1997), applies to Establishment Clause claims.  *See DeStefano*, 247 F.3d at 405.  The *Lemon* test requires that "a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion."  *County of Allegheny v. American Civil Liberties Union, Pittsburgh Chapter*, 492 U.S. 573, 592 (1989) (citing *Lemon*, 403 U.S. at 612-13); *see also Agostini*, 521 U.S. at 218.  The "tests must not be viewed," however, "as setting the precise limits to the necessary constitutional inquiry, but serve only as a guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired."  *Meek v. Pittenger*, 421 U.S. 349, 358-59 (1979).  Therefore, "[w]hile *Lemon* provides a framework for evaluating challenged activity or material," a complaint need not "specifically set forth its allegations in terms of *Lemon*."  *Mincone v. Nassau County Community College*, 923 F. Supp. 398, 404 (E.D.N.Y. 1996).

In the case at bar, the PAC plausibly alleges that the Faculty Defendants taught the Doe

Daughters religion during Spanish class, exposed them to their religious views outside of the classroom, and indoctrinated or attempted to indoctrinate them into a religious cult.  At this stage in the proceeding the Court cannot conclude that Plaintiffs will be unable to prove that the Faculty Defendants' conduct violated the Establishment Clause.

In moving to dismiss Plaintiffs' Establishment Clause claim, the Board relies on *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003), for the proposition that parents have no "fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children."  *Id.*  ( citation and internal quotation marks omitted).  The Board's reliance on *Leebaert* is misplaced.  The case speaks to the standard of review to which challenges to public school curricula must be subjected; it does not hold that a constitutional claim may never be based on challenges to school curricula.  In concluding, in that case, that a parent did not have a "fundamental" right, as a matter of constitutional law, to excuse his son from health education class, the Second Circuit acknowledged that "[r]equiring students to attend health education classes [must] serve[] a legitimate state interest and [be] reasonably related to that interest."  *Id.* at 138.  The Court of Appeals stated that health curriculum was subject to the "rational basis," rather than the "strict scrutiny" standard of review.  Implicit in the *Leebaert* rationale was the recognition that even if parents' right to direct public school curricula is not a *fundamental* right, a cause of action under the Establishment Clause may be established by demonstrating that a public school's curriculum serves no legitimate state interest.

A public school's discretion to select its curriculum is not unfettered.  It is circumscribed by the proscriptions of the First Amendment.  *See Lee v. Weisman*, 505 U.S. 577, 587 (1992) ("It is beyond dispute that, at minimum, the Constitution guarantees that government may not coerce

18

anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so.") (internal quotation marks and brackets omitted)).   To the extent the PAC directly challenges the school's curriculum, it plausibly alleges that Mastoloni exposed students to her religious ideology.  This is an aspect of the school's curriculum that does not serve a legitimate state interest and is prohibited by the Establishment Clause.  *C.f. Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000) (holding that school policy of permitting student-led, student-initiated prayer at football games violates the Establishment Clause); *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (holding that prayer delivered by rabbi at middle school graduation violated the Establishment Clause).

The Court notes, in any event, that the PAC's principal theory of liability is not based on Avon High School's curriculum; rather, the theory of the case is that the Board deprived Plaintiffs' of their First Amendment rights by indoctrinating the Doe Daughter into a religious cult.  That theory of liability is plausibly alleged in the PAC, and is not dependent on whether the school's curriculum passes constitutional muster.

### 2. J.D.'s Free Exercise Clause Claim

The PAC alleges that Defendants interfered with J.D.'s free exercise of religion in violation of the Free Exercise Clause of the First Amendment. The Free Exercise Clause, as applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. CONST. amend. I.  It encompasses both the "freedom to believe and freedom to act on one's beliefs." *Skoros v. City of New York*, 437 F.3d 1, 39 (2d Cir. 2006) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).  A Free Exercise claim will be sustained only if the "government has placed a substantial burden on the observation of a central

religious belief," without "a compelling governmental interesting justify[ing] the burden." *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–85 (1990) (internal quotation marks omitted).  "[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment [or practice] as it operates against him in the practice of his religion." *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1968); *see Newdow v. United States*, No. 13 CV 741 HB, 2013 WL 4804165, at *4 (S.D.N.Y. Sept. 9, 2013) (plaintiffs could not meet "'substantial burden' standard" absent showing that challenged conduct was coercive or resulted in penalty or denial of benefits linked to challenged conduct).

The PAC alleges that the religious indoctrination administered by the Faculty Defendants was "coercive, because students are compelled by law to attend school," and "imposed a substantial burden on J.D.'s free exercise of religion," which is Catholicism.  Doc. 67-2 at ¶¶ 673, 675, 679. These allegations are sufficient at this stage in the proceeding to demonstrate that the Faculty Defendants interfered with J.D.'s free exercise of religion.

### 3. <u>Jane and John's Hybrid Claim under the Free Exercise Clause and the Due Process Clause</u>

The PAC alleges a related "hybrid" claim on behalf of Jane and John: that Defendants deprived Jane and John of their parental right to raise their children in the religion of their choice (Catholicism) as guaranteed by the Free Exercise Clause of the First Amendment and Due Process Clause of the Fourteenth Amendment.  The Supreme Court recognized this type of "hybrid" claim in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 882 (1990).  The hybrid claim was also recognized in *Leebaert*, discussed *supra*, in which the Second Circuit held that a parent's claim based on a combination of the Free Exercise and Due Process clauses failed under the rational basis standard of review.  332 F.3d at 139.  At this stage in the

proceeding, the Court cannot conclude that the alleged actions of Defendants, including their religious indoctrination of the Doe Daughters, served a legitimate state interest. The PAC states a cognizable hybrid cause of action.

### 4. Intimate Relationship Rights under the Due Process Clause of the Fourteenth Amendment and Expressive Association Rights under the First Amendment

Plaintiffs allege that Defendants deprived them of their right to intimate familial relationships in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment by breaking up the Doe family and retaliating against Plaintiffs after J.D. successfully broke free from the Faculty Defendants' indoctrination.

The Board acknowledges that the constitution protects family privacy and integrity, but argues that there are limits on that protection when parents' relationship with their adult children are at stake. According to the Board, a constitutional violation of family liberty interest does not lie where state action has only an incidental effect on the parent's relationship with her adult child and is not aimed specifically at interfering with the relationship. The line of authority the Board cites in support of that proposition is inapposite to the circumstances at bar. The PAC alleges that the conduct of the Faculty Defendants was deliberately aimed at interfering with the Jane's and John's relationships with their children. It is the sort of conduct that is unconstitutional on its face. *See Daniels v. Williams*, 474 U.S. 327, 331 (1986) (stating that "[h]istorically, the guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property").

Contrary to the Board's related argument, Second Circuit authority recognizing claims for deprivation of intimate association rights have not limited such causes of actions to state action interfering with parents' relationships with their minor children. In *Patel v. Searls*, 305 F.3d 130 (2d

Cir. 2002), the plaintiff brought a § 1983 action, alleging that police officers impaired his relationships with his father, siblings, wife, and children by disseminating false information to those family members that caused them to believe that plaintiff had murdered his mother and sister. In addition to recognizing that plaintiff's relationship with his wife and child was subject to constitutional protection, the Court of Appeals found that "even though plaintiff did not live with his father and siblings . . . those relationships, too, were of such an intimate nature as to warrant the highest level of constitutional protection." *Id.* at 136. Under *Patel*, Plaintiffs' intimate association of rights claim is not precluded by the fact that the Doe Daughters have reached the age of majority or that E.D. and L.D. no longer live with their parents. The PAC states cognizable claims for deprivation of Plaintiffs intimate association rights.

An additional related issue requires discussion. The PAC asserts causes of action under both the First Amendment and the Due Process of Clause of the Fourteenth Amendment. In *Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999), the Second Circuit recognized that it has not been "authoritatively determined" whether the source of the intimate association right is grounded in the First Amendment or the Due Process Clause of the Fourteenth Amendment. *Id.* at 42. The plaintiff in that case alleged that the state violated his intimate association rights with his wife when it fired him from his job in retaliation for his wife filing a lawsuit against the state. The Second Circuit ultimately characterized his claim as arising under the First Amendment, noting that retaliatory action is often tested under that amendment. *Id.* at 43. The Court of Appeals noted, however, that claims based on the state burdening marital relationships have been analyzed under the Due Process Clause as well. *See id.,* 42-43. Later, in *Patel*, the Second Circuit analyzed plaintiff's right of intimate association without reference to a particular constitutional framework," noting that the cause

22

of action "is real despite the lack of exact knowledge regarding its derivation and contours." *Id.* at 133.  In other cases, the Second Circuit has analyzed intimate association rights between parents and children under a substantive due process framework.  *See Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999); *Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999)).

The PAC alleges not only that the Defendants interfered with their intimate familial relationships, but also that Defendants retaliated against Plaintiffs when J.D. broke free from the Faculty Defendants' religious indoctrination.  The allegations suggest causes of action under both the First Amendment and the Due Process Clause.  As stated above, the Second Circuit has analyzed state interference with the parent-child relationship under the substantive due process clause.  *See Anthony v. City of New York*, 339 F.3d 129, 143 (2d Cir. 2003); *Tenenbaum*, 193 F.3d at 559-601. The PAC plausibly alleges that the Faculty Defendants interfered with Jane's and John's relationship with their daughters and with J.D.'s relationship with her sisters.  Furthermore, because the PAC alleges conduct that was deliberate and resulted in E.D.'s and L.D.'s alienation from the family, the PAC plausibly alleges that the Faculty Defendants' actions were so shocking, arbitrary and egregious actions as to render them violations of Plaintiffs' substantive due process rights.  *Anthony,* 339 F.3d at 143 (stating that in order to prevail on familial association claim, plaintiff must demonstrate that defendant's conduct that was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it") (internal quotation marks omitted).  The Court therefore concludes that the PAC states an intimate rights claim under the Due Process Clause.

The PAC also alleges that Defendants "retaliated" against Plaintiffs for "engaging in expressive conduct[] protected by the First Amendment," namely Jane's and John's decision to free J.D. from religious indoctrination and J.D.'s decision to free herself from the same.  Doc. 67-2, at

¶¶ 619-20; 719–20.  According to the PAC, when J.D. broke from the indoctrination, the Faculty Defendants retaliated against Plaintiffs by removing E.D. and L.D. from the Doe household and defaming Jane and John in a letter Esposito sent to Wellesley College, which falsely stated that Jane and John were abusive towards E.D. and L.D.  In *Adler*, discussed *supra*, the Second Circuit found that an intimate association right claim may lie under the First Amendment where "adverse action is alleged to have been taken for exercise of any of the freedoms protected by the First Amendment." *Adler*, 185 F.3d at 43.  As the PAC plausibly alleges that the Faculty Defendants' retaliated against Plaintiffs for engaging in expressive conduct — their objections to religious indoctrination — the Court concludes that the PAC states a claim of violation of intimate association rights based on the First Amendment.

### 5.    Equal Protection Clause

Plaintiffs claim that Defendants violated their rights under the Equal Protection Clause of the Fourteenth Amendment, alleging that under a "class-of-one" theory, Plaintiffs were  intentionally singled out and treated differently from other-situated students and parents without a rational basis. They do not allege membership in a protected class.

In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the Supreme Court held that "where the plaintiff did not allege membership in a class or group," he may nonetheless seek equal protection if he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564.  "By preventing individuals who do not fit neatly into a recognized class from falling through the cracks, the Supreme Court established that the 'class of one' claim 'to secure *every* person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its

improper execution through duly constituted agents,' the very purpose of the Equal Protection Clause of the Fourteenth Amendment.'" *Pappas v. Town of Enfield*, 18 F. Supp.3d 164, 178 (D. Conn. 2014) (adding emphasis and quoting *Olech*, 528 U.S. at 564).

To succeed on a class-of-one claim, a plaintiff must establish that: (1) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (2) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

The PAC alleges that Plaintiffs are similarly situated to other students and parents in the Avon School district, and have been intentionally treated differently without a rational basis. Accepting those allegations as true on this motion to dismiss, they sufficiently state a claim that Plaintiffs have been deprived of the equal protection of the laws. It remains to be seen whether Plaintiffs , following discovery, are in a position to prove the truth of those allegations.

**B.    _Monell_ Liability**

The main thrust of Plaintiffs' proposed amended complaint is that the individual Faculty Defendants behaved wrongfully in their interactions with and indoctrination of Plaintiffs' two older daughters. We must know consider whether the Avon School Board may be liable under *Monell* for resulting injuries to Plaintiffs and their third daughter.

"A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee

was acting as a 'final policymaker.'" *Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423, 424-25 (2d Cir. 2004) (summary order).

The PAC's *Monell* claim is a variation on the second theory of liability: that the Board' adopted a policy or custom of deliberate indifference towards the constitutional rights of students and parents that directly and proximately caused Plaintiffs' injuries. The PAC alleges that the Board's policy or custom of deliberate indifference was apparent in two principal areas: its response to complaints from parents, and its failure to fund policies and training programs that would have prevented the Faculty Defendants' unlawful conduct. The PAC alleges that the Board prohibits complaints about abusive employees from being made to it directly by directing administrators who answer calls from parents to instruct those parents to raise their complaints with a lower level official, such as a teacher or principal, who rarely, if ever, refer the parents' concerns back up to the Board. When complaints do manage to reach the Board, the PAC alleges that the Board covers up the problem, protects the abuser, and retaliates against the complaining student or parent.

The PAC also alleges that the Board has not funded policies or adopting important training programs that would have prevented the Faculty Defendants from, *inter alia*, establishing inappropriate relationships with students, indoctrinating students under their care with religion, planting false memories of abuse into the minds of students, and disclosing students' class work and grades to third parties. *See* Doc. 67-2 at ¶ 443.

The PAC stops short of alleging that the conduct of the Faculty Defendants was in accord with a longstanding practice of indoctrinating students into religious cults and breaking up families. Rather, the theory of the case is that the policy or custom of deliberate indifference to civil rights violations caused Plaintiffs' injuries by leading the Faculty Defendants to believe that they could act

26

with impunity. *Id.* at ¶ 509.  On Plaintiffs' view of the case, that theory of causation raises a question of fact, to be decided by a jury should this case proceed to trial.  *See Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000) ("The issue of whether the relevant conduct of the pertinent policymaking official caused the injury of which the plaintiff complains is a question of fact for the jury.").

Plaintiffs' theory of *Monell* liability is based largely on the Board's inaction.  The Board, the PAC alleges, has failed to respond meaningfully to parents' complaints and failed to adopt training programs that would have prevented civil rights violations.  In *Monell*, municipal liability was based on the city's affirmative conduct, that is, an official policy requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary.  436 U.S. at 660-61. However, it is well-settled that *Monell* liability may be predicated on a municipality's failure to act. *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) ("A municipal policy may be pronounced or tacit and reflected in either action or inaction.").  "Specifically, *Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized" the unlawful conduct.  *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).  "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.*  (citing *Monell*, 436 U.S. at 690-91); *see Bd. of County Comm'rs v. Brown Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

In such circumstances, the municipality may be said to have been deliberately indifferent to the unconstitutional actions, or risk of unconstitutional actions, of its employees. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (recognizing "deliberate indifference" rule of liability in

27

context of failure to train police officers); *see also Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality) ("[M]unicipal liability under § 1983 attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers.)  "To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

The critical question before the Court is whether the PAC alleges that the Board's policy of deliberate indifference to civil rights violations was so "persistent or widespread as to acquire the force of law," *Reynolds v. Giuliani*, 506 F.3d at 192, or stated differently, that the Board demonstrated "deliberate indifference" to "a known or obvious consequence [its] action," *Brown*, 520 U.S. at 410.  The PAC's alleges that "on information and belief" the Board has retaliated against students or parents for making complaints; improperly investigated complaints; falsely told parents they are not entitled to see the disciplinary records of school employees; and have either not responded to complaints, responded to them superficially, or have responded to them by siding with the abusive employee.  *See id.* ¶¶ 477-86.  The Court must be skeptical of allegations based on "information and belief" that do not "make[] the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see also Salmon v. Blesser*, No. 1:13 CV 1037 MAD/RFT, 2014 WL 1883552, at *4 (N.D.N.Y. May 12, 2014) *aff'd in part, vacated in part and remanded on other grounds*, 802 F.3d 249 (2d Cir. 2015).  But these generalized averments are

coupled with buffeted by additional factual allegations that the Board either retaliated against a parent, responded in an inadequate or dilatory manner to a parent's complaint about a faculty member or issue at school, or failed to take appropriate steps to ensure that a constitutional violations would not happen in the future.  The PAC alleges that "in one incident, a coach who was verbally abusive towards students was reported to the Board, and not disciplined."  Doc. 67-2 at ¶ 489.  "[O]n . . . another occasion, the Board gave a male teacher several 'one more chances' after inappropriately touching female students over the years."  *Id.* ¶ 490.  The latter allegation, liberally construed, suggests that the Board was repeatedly notified of the teacher's transgressions and failed to take steps prevent future misconduct.

The PAC also recounts three interactions that Plaintiff Jane Doe had with the Avon leadership. The first involves an article she wrote in 2004:

> 492.    In or around 2004, Jane Doe wrote an article discussing the school budget.
>
> 493.    That article was published in a local newspaper.
>
> 494.    The Superintendent retaliated against Jane Doe by contacting the president of the Parent-Teacher Organization and demanding that Jane Doe no longer be permitted to act as the school board liaison for the Parent-Teacher Organization.

*Id.* ¶¶ 492-94.  Jane's second interaction with the Avon leadership occurred during the 2005-2006 school year:

> 495.    [I]n the 2005-2006 school year, Jane Doe had complaints about J.D.'s third grade teacher.
>
> 496.    The teacher had taken numerous pictures of the children in his class and published them on his school-sanctioned web page, without the parents' permission.
>
> 497.    Jane Doe brought her complaints to the Superintendent.

> 498.    Instead of the Superintendent immediately requiring the teacher to take the pictures off of his website, the Superintendent dragged his feet.
>
> 499.    Jane Doe had many meetings with the Superintendent over a period of months.
>
> 500.    Even though the website was controlled by the Board, and even though it involved an issue of the children's security, it took month after month of complaining to the Superintendent before the pictures were finally taken down.

*Id.* at ¶¶ 495-500.  Jane's third interaction with the Board occurred when E.D. was in eighth grade:

> 502.    E.D. was being subjected to terrible bullying (which is what made her vulnerable to the predatory indoctrination by Defendants Mastoloni, Kessler, Esposito, and Sullivan a year later).
>
> 503.    Jane Doe communicated with the Superintendent on numerous occasions to get the bullying to stop.
>
> 504.    The Superintendent and the Board were nonresponsive to Jane Doe's pleas for help.
>
> 505.    It was not until Jane Doe asked a police officer friend to come into school to protect E.D. that the Superintendent began to take the situation seriously, and only then did the bullying finally stop.

*Id.* at ¶¶ 502-505.

The PAC also alleges that the Board's policy of deliberate indifference is reflected in its "failure to discipline or retain" Sullivan after it learned that Sullivan had filed a "false abuse report against the father [of two Avon students] with the Connecticut Department of Children and Families."  *Id.* ¶¶ 448, 458.  The PAC alleges that "the two children had been . . . indoctrinated by . . . Sullivan to believe that they were abused" by their father.  As a result of her false abuse report, the children were removed from their father's home.  *Id.* ¶ 451.  Though ultimately "exonerated" in court, the father has had no contact with his children in the last four years.  *Id.* at ¶¶ 454-55.

30

Accepting the PAC's allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, the PAC's allegation that the Board was deliberately indifferent to the unconstitutional conduct of employees, or the risk of such unconstitutional conduct, is plausible. The PAC alleges that the Board had notice of employee misconduct or issues affecting (or potentially affecting) the civil rights of students on several occasions, and either did not address the misconduct or responded in a dilatory or ineffectual manner. Those allegations permit the inference that the Board was aware of its employees' actions and consciously chose to not respond in a way that would curb further instances of misconduct; and that the Faculty Defendants, in turn, were emboldened by a culture in which complaints from parents were not addressed and employees went undisciplined. *Cf. Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d. Cir. 2012) (stating that burden of showing municipal liability under *Monell* may be accomplishing by a "showing of deliberate indifference on the part of supervisory personnel to abuse of the rights of black people, which was communicated to line officers so as to give them the sense that they could engage in such abuse without risking appropriate disciplinary consequences").

While the question of whether the PAC states a *Monell* claim against the Board is a close one, the PAC includes just enough factual allegations to survive the Board's motion to dismiss. Whether Plaintiffs' theory of Board liability based on *Monell* would survive a motion for summary judgment following discovery is a different question.

**C.    42 U.S.C. §§ 1985 and 1986**

Plaintiffs also allege that the Board conspired to interfere with their civil rights in violation of 42 U.S.C. § 1985, and neglected to prevent a conspiracy to interfere with their civil rights in violation of 42 U.S.C. § 1986. "Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies

31

undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws.'" *Jews for Jesus, Inc. v. Jewish Cmty. Relations Counsel of N.Y., Inc.*, 968 F.2d 286, 290 (2d Cir. 1992) (quoting 42 U.S.C. § 1985(3)). "The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . .; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) (alternations in original) (internal quotation marks omitted). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Furthermore, the "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006).

The Board moves to dismiss Plaintiffs' § 1985 claims on grounds that they have not alleged that any of the Board's conduct was motivated by class-based animus. Relying on *Robinson v. Allstate Ins. Co.*, 508 Fed. Appx. 7 (2d Cir. 2013) (summary order), Plaintiffs argue that a § 1985 claim may be premised on a "class-of-one" theory of liability. In that case, the Second Circuit concluded that the plaintiff's § 1985 claim based on a class-of-one theory of liability failed because the plaintiff failed to establish that he was intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment. *Id.* at 10. Plaintiffs argue that the implication of the Court of Appeals' ruling was that if there had been facts showing animus towards plaintiff, the fact that he was a "class of one" would not have barred the claim.

Even if the Court were to accept Plaintiffs' interpretation of *Robinson*, summary orders, especially dicta in summary orders, "do not have precedential effect." Second Circuit L.R. 32.1.1(a); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) ("a summary order is not citable as precedent."). It is in any event, doubtful that the Second Circuit in *Robinson* was implying that a § 1985 claim may sustained where no showing of racial or class-based animus has been made. The Court of Appeals in that case reiterated the oft-cited requirement that a conspiracy claim under § 1985 "must be . . . motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.* at 9 (internal quotation marks omitted). Elsewhere, the Second Circuit has stated that this requirement is to be "strictly construed." *Katz v. Klehammer*, 902 F.2d 204, 208 (2d Cir. 1990) (noting that in *United Board of Carpenters & Joiners v. Scott*, 43 U.S. 825, 834-35 (1983) the Supreme Court held that § 1985(3) was not intended to reach conspiracies motivated by bias towards others on account of their economic status); *see Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (dismissing conspiracy claim where plaintiff "failed to allege membership in a class protected under § 1985(3)").

Moreover, the Court can find no authority, nor do Plaintiffs cite any, which have construed *Robinson* as recognizing a § 1985 claim based on a class of one theory. In fact, district courts in this Circuit have expressly held that a § 1985 claim may not be premised on a class of one theory. *Volunteer Fire Ass'n of Tappan, Inc. v. Cty. of Rockland*, No. 09 cv 4622 CS, 2010 WL 4968247, at *8 n. 13 (S.D.N.Y. Nov. 24, 2010) ("A plaintiff alleging a Section 1985 violation may not proceed under a 'class of one' theory."); *Orr v. Wisner*, No. 3:08 CV 953 (JCH), 2010 WL 2667918, at *9 n. 9 (D. Conn. June 29, 2010) (stating that "[t]he emerging consensus among federal authority . . . falls against the 'class of one' theory in the § 1985(3) context.") (internal quotation marks omitted);

33

*Chance v. Reed*, 583 F. Supp. 2d 500, 509 (D. Conn. 2008) ("The 'class of one' theory is insufficient to form the basis of a § 1985 action.").  And while the Second Circuit does not appear to have directly addressed the question, other federal circuit courts have reached the same conclusion.  *See Royal Oak Entm't, LLC v. City of Royal Oak, Michigan*, 205 F. App'x 389, 399 (6th Cir. 2006); *C & H Co. v. Richardson*, 78 F. App'x 894, 901-02 (4th Cir. 2003);*Burns v. State Police Ass'n of Massachusetts*, 230 F.3d 8, 12 n.4 (1st Cir. 2000).

Finally, given the reluctance of the Supreme Court and the Second Circuit to turn § 1985 into "general federal tort law," the Court is unable to conclude that Plaintiffs were among those whom the statute was designed to protect.  *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Carpenters*, 463 U.S. at 850 (Blackmun, J. dissenting) (stating that "the class must exist independently of the defendant's actions; that is, it cannot be defined simply as the group of victims of the tortious action"); *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993) (concluding that "'women seeking abortion' is not a qualifying class" and stating that "[w]hatever may be the precise meaning of a 'class' . . . the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) disfavors").

The question of whether a class of one theory may ever form the basis of a § 1985 conspiracy claim aside, the PAC does not provide factual allegations showing a "meeting of the minds," such as that defendants "entered into an agreement, express or tacit, to achieve the unlawful end," where and when the agreement was consummated, or specific communications suggestive of a conspiratorial agreement.  *Webb*, 340 F.3d at 110.  The PAC's claim that Defendants conspired to deprive Plaintiffs of their constitutional right is conclusory and would fail even if Plaintiffs had alleged class-based discriminatory animus. *Cf. Vertical Broad, Inc. v. Town of Southampton*, 84 F.

Supp. 2d 379, 389–90 (E.D.N.Y. 2000) (finding that conspiracy claims under section 1985(3) must contain "specific factual allegations," and a complaint consisting of "nothing more than conclusory or vague allegations of conspiracy is insufficient to survive a motion to dismiss").

Because the PAC fails to state §1985 claims, it also fails to state a cause of action under §1986. 42 U.S.C. §1986 provides that any "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do" shall be liable to the injured party. It is well-established that a violation of §1986 is contingent on a violation of §1985, since the former provides a remedy for the latter. *See Dwares v. New York*, 985 F.2d 94, 101 (2d Cir. 1993) ("Liability under § 1986 . . . is dependent on the validity of a claim under § 1985.") (citation omitted); *accord Johnson v. City of New York*, 669 F. Supp. 2d 444, 452 (S.D.N.Y. 2009).

## D.    Connecticut Constitutional Claims

The PAC alleges that Defendants deprived them of their rights guaranteed by the following provisions of the Connecticut Constitution: Article First, § 3 ("The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state . . ."); Article First, § 4 ("Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."); Article  First, § 5 ("No law shall ever be passed to curtail or restrain the liberty of speech or of the press."); Article First, § 8 (". . . No person shall be . . . deprived of life, liberty or property with due process of law . . ."); Article First, § 20 ("No person shall be denied equal protection of the law . . ."); Article Seventh (. . . "no person shall by law be compelled to join or support, nor be classed or associated with, any congregation,

church or religious association. . . ."); and Article Eighth, § 1 ("There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."). The Board argues that these claims should be dismissed because the Connecticut Supreme Court has not recognized a private right of action for monetary damages under these particular provisions of the state constitution. Plaintiffs do not point to any authority recognizing a private right of action under Article First, §§ 3, 4, 5, 8 and 20, Article Seventh or Article Eighth, but urge the Court to recognize these claims based on the rationale espoused in *Binnete v. Sabo*, 244 Conn. 23 (1998).

In *Binette*, the Connecticut Supreme Court held that the Connecticut Constitution gives rise to a private cause of action for monetary damages under Article First, §§ 7 and 9. The *Binette* Court emphasized, however that this holding "does not mean that a constitutional cause of action exists for every violation of [the] state constitution." *Id.* at 47. Rather, the court stated that whether to recognize a cause of action for alleged violations of other state constitutional provisions must be "determined on a case-by-case basis" through a "multifactor analysis" that examines "the nature of the constitutional conduct; the nature of the harm; separation of powers considerations and other factors articulated in [*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)] and its progeny; the concerns expressed in [*Kelley Property Development, Inc. v. Lebanon*, 226 Conn. 314, 330-33 (Conn. 1993)]; and any other pertinent factors brought to light by future litigation." *Id.* at 48.

The courts in this federal district asked to create a remedy under other state constitutional provisions have by-and-large declined to do so for the reasons stated by Judge Kravitz in *Lopez v. Smiley*, 375 F. Supp. 2d 19 (D. Conn. 2005) a decade ago. In declining to exercise supplemental

jurisdiction over claims for money damages and declaratory and injunctive relief based on violations of Article First, §§ 4, 5, 7, 8, 9, 10 and 14, Judge Kravitz stated:

> Mr. Lopez's states constitutional claims are clearly novel, they are complex, and they are not well developed under Connecticut law. In light of the Connecticut Supreme Court's explicit statement in *Binette* that the Supreme Court did not intend to create a cause of action for money damages for every alleged violation of the Connecticut state constitution, . . . .and the fact that federalism and comity concerns strongly suggest that recognition of new state constitutional torts should be determined on a case-by-case basis by *Connecticut courts* in the first instance, this Court will refrain from exercising supplemental jurisdiction over all of Mr. Lopez's Connecticut constitutional claims (both those seeking monetary damages and those seeking injunctive or declaratory relief).

*Id.* (emphasis in original). Courts after *Lopez* have expressly adopted its rationale in declining to recognize causes of action under the Connecticut Constitution. *See Gothberg v. Town of Plainville*, No. 3:13 cv 01121 (CSH), — F. Supp.3d —, — , 2015 WL 7785797, at *14 (D. Conn. Sept. 3, 2015) (declining to recognize a private right of action Article First, § 8); *Crowley v. Town of Enfield,* No. 3:14 cv 01903 (MPS), 2015 WL 4162435, at *3 (D. Conn. July 9, 2015) (declining to recognize a private right of action under Article First, §§ 8 and 20); *Miller v. Hous. Auth. of City of New Haven*, No. 3:13 cv 1855 (JBA), 2014 WL 2871591, at *11 (D. Conn. June 24, 2014) (declining "to create a new theory of tort liability implicating the Connecticut Constitution"); *Doutel v. City of Norwalk*, No. 3:11 cv 01164 (VLB), 2013 WL 3353977, at *27 (D. Conn. July 3, 2013) (declining to recognize a private right of action under Article First, § 15); *M.A. v. City of Torrington*, No. 3:10 cv 1890 (JBA), 2012 WL 3985166, at *4 (D. Conn. Sept. 10, 2012) (declining to recognize a cause of action under Article Fist, § 20); *Silvera v. Connecticut Dep't of Corr.* 726 F. Supp. 2d 183, 199 (D. Conn. 2010) (Kravitz, *J.*) (declining to recognize a private right of action under Article First, §§ 9 and 20); *see also Marshall v. Town of Middlefield*, No. 3:10 cv 1009 (JCH), 2012 WL 601783, at *9 (D.

Conn. Feb. 23, 2012) (citing *Lopez* and declining to recognize a private right of action under Article First, §§ 4 and 20); *Ward v. Housatonic Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 356 (D. Conn. 2001) ("The court finds that there is no private cause of action for monetary damages under the equal protection and due process provisions [Art. First, §§ 1, 8, and 20] of the Connecticut Constitution.").

The Court is persuaded by this weight of authority and declines to exercise supplemental jurisdiction over potential claims under the Connecticut constitution raising novel and complex questions not well developed under state law. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raises a novel or complex issue of State Law . . ."). Plaintiffs' state constitutional claims will be dismissed without prejudice to their right assert them in state court.

**E.    Conn. Gen. Stat. § 52-571b**

The PAC alleges that the Board violated the Connecticut Act Concerning Religious Freedom (CACRF), Conn. Gen. Stat. § 52-571b, which provides that "[t]he state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 article first of the Constitution of the state even if the burden results from a rule of general applicability" except where application of such a burden "is in furtherance of a compelling governmental interest, and [ ] is the least restrictive means of furthering that compelling governmental interest." Conn. Gen. Stat. § 52-57b(a), (b). In support of this cause of action, the PAC alleges that the Defendants imposed a substantial burden on Plaintiffs' free exercise of the Catholic religion without a compelling reason or rational basis for doing so. The claim tracks Plaintiffs' First Amendment Free Exercise claim, which the Court has concluded is cognizable. Because "the overarching purpose of § 52-57b was to provide more protection for religious freedom under Connecticut law than the" Free Exercise

Clause, the Court concludes that the PAC states a claim under the statute. *Rweyemamu v. Comm'n on Human Rights & Opportunities*, 98 Conn. App. 646, 660 (Conn. 2006) (explaining that the Connecticut Legislature passed § 52-57b in response to *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which held that the compelling state interest test was inapplicable to free exercise challenges).

The Board recognizes that Plaintiffs have stated a cognizable claim under § 52-57b, which is why in support of their motion to dismiss, they state merely that the claim should be dismissed because "Connecticut courts have never recognized a case analogous to the one at bar in which the subject of it involved a student bringing a claim against a school for violation of his or her free exercise of religion" under the statute. It appears that to the extent that statement is true, it is because no one has ever before claimed that a Connecticut public school has interfered with their free exercise of religion under § 52-57b — not because Connecticut courts have concluded the cause of action does not apply to constitutional challenges in the public school space as a matter of law. Nothing in the text of the statute suggests that its protections do not extend to free exercise challenges in school settings or are otherwise circumscribed by context. In practice, free exercise challenges under the First Amendment are often directed at the practices and policies of school administrators or state laws concerning the education of children. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Lemon v. Kurtzman*, 403 U.S. 602 (1971); *Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003). The Board's motion to dismiss Plaintiffs' § 52-57b claims will be denied.

**F.    Common Law Claims**

The PAC charges the Board with following common law causes of action: "defamation," "defamation by innuendo," "invasion of privacy/false light," "invasion of privacy/intrusion upon

seclusion," "invasion of privacy/public disclosure of private facts," "negligence," "negligent infliction of emotional distress," and "negligent retention and supervision of Sullivan."   The defamation, defamation by innuendo and false light claims are based on the allegation that Esposito sent a written communication to Wellesley college "falsely accusing" Jane and John of abusing their children, as well as decidedly conclusory allegations that Defendants, at an unspecified time and place and in some unspecified manner, "published statements" about Plaintiffs that were "defamatory" or portrayed Plaintiffs in a "false light." Doc. [67-2] (counts XX-XXII).  The intrusion upon seclusion and public disclosure of private facts claims are based on allegations that the Faculty Defendants "intentionally intruded upon" Plaintiffs' "seclusion and private affairs . . . by inquiring into personal an intimate details of the Doe's family life"; "intruded upon the seclusion of" Plaintiffs by "barging into the Doe family home without being invited in"; and/or, in Mastoloni's case, "intrud[ing] upon the seclusion of J.D. by disclosing her written class work and grades to E.D." *Id.* (counts XXIII -XIV).  The negligence and negligent infliction of emotional distress claims are based on allegations that Defendants breached their duty of care to Plaintiffs or created an unreasonable risk of causing Plaintiffs emotional distress by, *inter alia*, "indoctrinating E.D., L.D., and J.D. in the [Faculty Defendant's] religion" and "alienating E.D. and L.D." from Plaintiffs.  *Id.* (counts XXV-XXVI).  Finally, the PAC's claim for negligent retention and supervision is based on allegations that the Board was negligent in retaining and failing to properly supervise Sullivan in light of its knowledge that she falsely informed DCF that a parent in the Avon school district was abusing his children.  *Id.* (count XXVII).

The Board moves to dismiss Plaintiffs' common law claims, arguing that they are barred by the doctrine of governmental immunity.  The Connecticut legislature abrogated the common law

doctrine of governmental immunity and codified the tort liability of municipalities in Conn. Gen.

Stat. § 52-557n.  Subsection (a) of that statute states, in relevant part:

> (1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omission of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties. . . . (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

Conn. Gen. Stat. § 52-557n.  As stated in the text, the statute contemplates exceptions to municipal

liability for the "willful" acts of employees — a term which under Connecticut law is synonymous

with "intentional," *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184,194 (D. Conn. 2000) — and the

negligent conduct of employees involving the exercise of discretion.  The Board argues that the

PAC's common law claims are barred under both exceptions.  First, the Board argues that though not

styled as such, each common law cause of action is in substance an *intentional* tort.  Second, the

Board argues that to the extent such claims may be construed as alleging negligent conduct, the PAC

alleges that Defendants acted negligently within the context of determinations necessarily involving

the exercise of judgment or discretion.

Plaintiffs acknowledge that municipal liability may not be based on intentional torts, but

maintain that, as a matter of law, they may establish all of their tort claims by pleading negligent as

opposed to intentional misconduct.  Furthermore, they claim that while municipalities may claim

immunity when the employees' actions at issue are discretionary, in the circumstances at bar the

Faculty Defendants had no discretion to indoctrinate students into a religious cult, alienate them from

their families, or otherwise commit the torts alleged.  Plaintiffs argue, in the alternative, that to the extent the Faculty Defendants were negligent in breaching their discretionary duties, the Board is liable for their conduct under a common law exception to governmental immunity, which abrogates "[d]iscretionary act immunity . . . when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." *Doe v. Petersen*, 279 Conn. 607, 616 (Conn. 2006).  Toward that end, Plaintiffs argue that after the Board learned of Sullivan's propensity to make false allegations of abuse and indoctrinate students into believing they had been abused, the Board knew or should have known that its failure to retain or supervise Sullivan would likely subject an identifiable class of people (students and their parents) to imminent harm caused by Sullivan repeating her actions.

Assuming, without deciding, that Plaintiffs could plead their common law claims by alleging mere negligence, they fail as a matter of law because Defendants are alleged to have committed acts that require the exercise of discretion or judgment and the imminent harm/identifiable person exception that abrogates discretionary act immunity does not apply in these circumstances.  "[A] municipality is  immune from liability for the performance of governmental acts as distinguished from ministerial acts . . .  Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature . . . [M]inisterial acts are performed in a prescribed manner without the exercises of judgment or discretion . . ." (citations omitted; internal quotation marks omitted.) *Elliot v. Waterbury*, 245 Conn. 385, 411 (1998).

Plaintiffs claim that Defendants had no "discretion" to commit the torts alleged.  That is true perhaps in a vernacular sense.  The Defendants had no "discretion" under the law or any legal right to defame Plaintiffs or intrude upon their privacy.  The same could be said of police officers.  They

42

never have "discretion" or lawful authority to use excessive force when making arrests, yet it is well-settled that "[t]he manner in which a police officer makes an arrest fits within the framework of the day to day discretion exercised by police offers." *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 367 (D. Conn. 2008) (citing *Galindez v. Miller*, 285 F. Supp. 2d 190, 195 (D. Conn. 2003). The Faculty Defendants necessarily exercised their judgment and discretion in engaging in the conduct upon which the common law claims are based — in choosing, for example, to indoctrinate the Doe Daughters with religion, defame Plaintiffs and intrude upon their privacy. It is the sort of intentional conduct for which municipal liability does not attach, but to the extent it is merely negligent in nature, it amounts to discretionary acts that are also excepted from the rule of municipal liability prescribed in § 52-557n. *Cf. Grasson v. Bd. of Educ. of Town of Orange*, No. 3:09 cv 1584 (PCD), 2010 WL 1444570, at *3 (D. Conn. Apr. 12, 2010) (concluding that conversion and negligent infliction of emotional distress claims based on school board's cancellation of contract for busing services were barred by Conn. Gen. Stat. § 52-557n(a)(2)(B) where "board members had to vote to terminate the contract, [and] any argument that their actions did not require judgment or discretion would be illogical"). The same is true for the Board's alleged failure to retrain and properly supervise Sullivan after learning that she had submitted a false report of parental abuse to DCF. Under "Connecticut precedent" the "acts or omissions concerning the supervision, control and discipline of employees are discretionary acts as a matter of law." *Jarry v. Southington Bd. of Educ.*, No. 3:08 cv 954(WWE), 2009 WL 179817, at *2 (D. Conn. Jan. 22, 2009) (citing *Hughes v. City of Hartford*, 96 F. Supp. 2d 114, 118 (D. Conn. 2000).

Finally, there is no merit in Plaintiffs' argument that the Board does not enjoy governmental immunity as to the negligent retention and supervision claim regarding Sullivan because

discretionary act immunity is barred "when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." *Doe v. Petersen*, 279 Conn. 607, 614 (Conn. 2014). "This identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. . . . All three must be proven in order for the exception to apply." *Haynes v. City of Middletown*, 314 Conn. 303, 313-14 (Conn. 2014) (internal quotation marks omitted).[5] "[T]he ultimate determination of whether [government] immunity applies is ordinarily a question of law for the court . . . [unless] there are unresolved factual issues material to the applicability of the defense . . . [where] resolution of those factual issues is properly left to the jury." *Purzycki v. Fairfield*, 244 Conn. 101, 107-08 (Conn. 1998) (internal quotation marks omitted).

The identifiable person-imminent harm exception does not apply in this case because the PAC does not allege that the Board subjected students and parents to an *imminent* harm by failing to supervise or retrain Sullivan. Plaintiffs argue that the risk of harm was imminent because it was "foreseeable" that Sullivan would subject them and other students to predatory indoctrination and

---

[5]  In addition to these requirements, trial courts in Connecticut "have consistently held that the imminent harm complained of must be physical in nature in order for the exception to apply." *Petrillo v. Town of Clinton*, No. MMXCV136010856, 2015 WL 829396, at *4 (Conn. Super. Ct. Feb. 2, 2015) (collecting cases for the proposition); *Bento v. City of Milford*, No. 3:13 cv 1385 (JBA), 2014 WL 1690390, at *6 (D. Conn. Apr. 29, 2014) (concluding that plaintiff was "not covered by identifiable person-imminent harm exception" where amended complaint was "completely devoid of any allegation of physical symptoms or consequences suffered" by plaintiff"). The PAC alleges that Defendants' tortious conduct caused them to suffer damages of largely non-physical nature, including damages resulting from emotional pain and anguish, loss of intimate famial relationships and injury to reputation. *See, e.g.*, Doc. 67-2, at ¶¶ 1025-27. These reoccurring allegations run throughout the PAC; however, at paragraph 1108, the PAC states that "[t]he emotional distress suffered by the Plaintiffs was severe enough that it might have resulted in illness or bodily harm." *Id.* at at ¶ 1108. Construing this allegation liberally, Plaintiffs have alleged, albeit just barely, that Defendants' conduct caused them physical harm.

predatory alienation.  As explained by the Connecticut Supreme Court, however, a foreseeable event is not necessarily an imminent one.  In *Bonington v. Town of Westport*, 297 Conn. 297 (Conn. 2010), Paul and Julie Bonington, residents of Westport, Connecticut, sued the town of Westport, its planning and zoning department and zoning officials (collectively, "the town") for negligence, claiming that in violation of zoning regulations, the town failed to rectify zoning violations on a property abutting the Bonington's property.  Specifically, the Boningtons claimed that a contractor, who was building a house on the abutting property, "imported substantial landfill that raised the grade of the abutting property . . . and increased the water runoff onto plaintiffs' property, which caused flooding and threatened to erode a wall on the plaintiffs' property."  *Id.* at 299.  Despite their repeated complaints to the town planning and zoning department, zoning officials never satisfactorily addressed the Boningtons' concerns.  The couple sued the town both for damages to their property, which flooded and eroded every time it rained, and for legal fees they incurred in suing the owners of the abutting property.  In concluding that the town was immune from liability under § 52-557n, the Connecticut Supreme Court rejected the Boningtons' claim that discretionary act immunity was abrogated by the identifiable person-imminent harm exception:

> We conclude that such claims fall short of the limited circumstances under which imminent harm may be established.  Imminent does not simply mean a foreseeable event at some unspecified point in the not too distant future.  Rather, we have required plaintiffs to identify a discrete place and time period at which the harm will occur.

*Id.* at 314.  After citing case law showing that public officials must have had a "specific awareness of the imminent harm at issue," *id.*, the court went on to state that:

> Although the plaintiffs' property undoubtedly constitutes a discrete place, and rainfall inevitably would occur at that site at some point in the future, a significant rainfall causing excessive surface runoff necessarily would occur at an indefinite point in time.  Such harm is

45

> not imminent.  Similarly, even if the defendants "should have known"
> that their failure to respond satisfactorily to the plaintiffs' complaints
> would force the plaintiffs to initiate legal action and in turn incur
> legal expenses, there was no definite point in time when the plaintiffs
> necessarily **would** have undertaken such action.

*Id.* at 315.  In the circumstances at bar, it may not only have been foreseeable that Sullivan would have subjected Plaintiffs and other students to predatory indoctrination and alienation, it may even have been, to borrow from *Bonington*, "inevitabl[e]." *Id.*  The PAC, however, does not demonstrate the Board was aware of a "definite point in time" in which Sullivan was going to subject the Doe Daughters to religious indoctrination and predatory alienation.  *Id.*.; *cf. Merrit v. Town of Bethel Police Dep't*, 120 Conn. App. 806, 815–16 (Conn.2010) (concluding that trial court had properly granted motion to strike as identifiable person subject to imminent harm exception did not apply because the complaint did not demonstrate that police officer "had a prescient knowledge" that victim would be shot and killed at a specific time and place).  The PAC therefore fails to state that an imminent harm was apparent to the Board.

The Court's interpretation of *Bonington* is consistent with Connecticut case law recognizing that "[t]he discrete person/imminent harm exception to the general rule of governmental immunity for employees engaged in discretionary activities has received very limited recognition in this state." *Evon v. Andrews*, 211 Conn. 501, 507 (Conn. 1989) (Covello, J.).  As explained by the Connecticut Supreme Court, the exception applies only where "the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity — to encourage municipal officers to exercise judgment — has no force." *Durrant v. Bd. of Educ. of City of Hartford*, 284 Conn. 91, 106 (Conn. 2007).  This is because "[t]he adoption of a rule of liability where some kind of harm *may* happen to someone would cramp the exercise of official discretion

beyond the limits desirable in our society." *Evon v. Andrews*, 211 Conn. 501, 508 (Conn. 1989) (emphasis added; internal quotation marks omitted).  The PAC's allegations did not give rise to the inference that it was apparent to the Board that its failure to retrain or supervise created an imminent risk of harm.

**IV**

For the reasons stated above, Plaintiffs' Motion to Amend to the Complaint [Doc. 67] and the Board's Motion to Dismiss Plaintiffs' Proposed Amended Complaint [Doc. 71] are GRANTED IN PART AND DENIED IN PART.

Plaintiffs are directed to file separately an Amended Complaint that comports with this Ruling within 30 days of the ruling.  If after reflection and due consideration J.D. chooses to join this lawsuit, the Amended Complaint should reflect her status as a named-plaintiff.

The Board and the Faculty Defendants are directed to file their respect Answers to the Amended Complaint within 30 days of the filing of the Amended Complaint.

It is SO ORDERED.

Dated:   New Haven, Connecticut
            February 12, 2016

*/s/ Charles S. Haight*
CHARLES S. HAIGHT, JR.
Senior United States District Judge
