## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANE DOE, a Connecticut resident; JOHN DOE, a Connecticut resident; and J.D., a Connecticut resident; | Civil Action No.: 3:14-cv-00718 (CSH) |
| | FIRST AMENDED COMPLAINT |
| Plaintiffs, | JURY TRIAL DEMANDED |
| - against – | |
| TANYA MASTOLONI (aka Tanya Romero), a Connecticut resident; REBECCA KESSLER (nee Rebecca Wills), a Connecticut resident; CHRISTOPHER ESPOSITO, a California resident; LAURA SULLIVAN, a Connecticut resident; and AVON PUBLIC SCHOOLS, a.k.a AVON BOARD OF EDUCATION, a Connecticut public school district. | |
| Defendants. | |

Plaintiffs, Jane Doe, John Doe, and J.D., by and through their attorney, Paul S. Grosswald, by way of First Amended Complaint against the above-named Defendants, hereby alleges the following:

## INTRODUCTION

1. This case arises out of the unlawful and predatory religious indoctrination and familial alienation of students by three teachers and a guidance counselor in a public school.

2. The predatory religious indoctrination and familial alienation was inflicted by Defendants Mastoloni, Kessler, Esposito, and Sullivan.

3. Defendants Mastoloni, Kessler, Esposito, and Sullivan inflicted the predatory religious indoctrination and familial alienation on students without the knowledge or consent of the parents. To the contrary, Defendants Mastoloni, Kessler, Esposito, and Sullivan have actively concealed their predatory religious indoctrination and familial alienation from the parents.

4. Plaintiffs Jane and John Doe have three daughters.

5. All three of their daughters were subjected to the predatory religious indoctrination while attending Avon High School.

6.      All three daughters experienced sudden and severe personality changes. They became flat and distant, reclusive, secretive, and non-communicative. They lost their humor and their empathy. They began speaking in a bizarre new language. They became unable to think critically or independently. They became dependent on the school teachers and guidance counselor who had indoctrinated them, especially Defendant Tanya Mastoloni.

7.      On information and belief, the two older Doe daughters were indoctrinated into a religious cult that promotes martyrdom, and celebrates death. This has caused the elder Doe daughters to experience fantasies of suicidal ideation and martyrdom.

8.      Defendants Mastoloni, Kessler, Esposito, and Sullivan also indoctrinated the two older Doe daughters to believe that their parents had abused them.

9.      Defendants Mastoloni, Kessler, Esposito, and Sullivan successfully planted false memories of abuse in the minds of each of the two older Doe daughters.

10.     The youngest Doe daughter, J.D., was targeted to be indoctrinated into the same belief system, but she eventually broke free. J.D. has now joined her parents as a Plaintiff in this case.

11.     To retaliate for J.D.'s defection, Defendants Mastoloni, Kessler, Esposito, and Sullivan used their undue coercive influence to get the two older Doe daughters to cut off all of their communications with the rest of the Doe family, including extended family. The two older Doe daughters have also cut off all of their communications with their high school friends.

12.     Defendants Mastoloni, Kessler, Esposito, and Sullivan pose a serious threat to the Avon community and the public at large. They each exert significant influence over the impressionable high school students who have been entrusted to their care. There is an obvious power differential between students and their teachers and guidance counselors.

13.     Defendants Mastoloni, Kessler, Esposito, and Sullivan have consistently targeted minors and pursued them until they were of age in order to complete the conversion to martyrdom. Because of that, Defendants Mastoloni, Kessler, Esposito, and Sullivan pose a serious danger to students, students' families, and the public at large.

14.     This lawsuit seeks to hold Defendants Mastoloni, Kessler, Esposito, and Sullivan accountable for the harm they have caused, and to deter them from inflicting any future harm.

15.     This lawsuit also seeks to hold Avon Public Schools accountable for its failure to properly supervise and control its employees, and for allowing its employees to engage in predatory religious indoctrination and familial alienation in school.

## SUBJECT MATTER JURISDICTION AND VENUE

16.     This Court has jurisdiction over all of the Plaintiffs' federal claims, pursuant to 28 U.S.C. § 1331.

17.     Moreover, this Court has jurisdiction over the Plaintiffs' federal civil rights claims, pursuant to 28 U.S.C. § 1343.

18.     This Court has jurisdiction over the Plaintiffs' state claims, pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to the Plaintiffs' claims occurred in this judicial district, and because several of the Defendants reside in this judicial district.

## PARTIES AND PERSONAL JURISDICTION

**Plaintiff**

20.     The Plaintiffs Jane Doe, John Doe, and J.D., are a mother, father, and daughter, respectively, who reside in Avon, Connecticut.

**Defendants**

21.     Defendant Tanya Mastoloni (a.k.a. Tanya Romero), was a Spanish teacher at Avon High School at all times relevant for this First Amended Complaint.

22.     Defendant Rebecca Kessler (nee Rebecca Wills) was a Spanish teacher at Avon High School at all times relevant for this First Amended Complaint.

23.     Defendant Christopher Esposito was a Spanish teacher at Avon High School until 2011.

24.     Defendant Laura Sullivan was a guidance counselor at Avon High School at all times relevant for this First Amended Complaint.

25.     Defendant Avon Public Schools, a.k.a. the Avon Board of Education ("Defendant Avon Public Schools" or the "Board") is the school board that operates Avon High School and employs Defendants Mastoloni, Kessler, and Sullivan, and which previously employed Defendant Esposito.

**Personal jurisdiction**

26.     This Court has general personal jurisdiction over Defendant Mastoloni because she resides and works in Connecticut.

27.     This Court has specific personal jurisdiction over Defendant Mastoloni because the complained of actions and omissions occurred primarily in Connecticut, and because her tortious conduct was directed at the Plaintiffs in Connecticut.

28.     This Court has general personal jurisdiction over Defendant Kessler because she resides and works in Connecticut.

29.     This Court has specific personal jurisdiction over Defendant Kessler because the complained of actions and omissions occurred primarily in Connecticut, and because her tortious conduct was directed at the Plaintiffs in Connecticut.

30.     This Court has specific personal jurisdiction over Defendant Esposito because the complained of actions and omissions occurred primarily in Connecticut, and because his tortious conduct was directed at the Plaintiffs in Connecticut.

31.     This Court has general personal jurisdiction over Defendant Sullivan because she resides and works in Connecticut.

32.     This Court has specific personal jurisdiction over Defendant Sullivan because the complained of actions and omissions occurred primarily in Connecticut, and because her tortious conduct was directed at the Plaintiffs in Connecticut.

33.     This Court has general personal jurisdiction over Defendant Avon Public Schools because it operates a school district in Avon, Connecticut.

34.     This Court has specific personal jurisdiction over Defendant Avon Public Schools because the complained of actions and omissions occurred primarily in Connecticut, and because its tortious conduct was directed at the Plaintiffs in Connecticut.

## FACTUAL ALLEGATIONS

### Background Information

35.     Jane and John Doe have three daughters: E.D. (24), L.D. (21), and J.D. (18).

36.     All three daughters attended Avon High School.

37.     Three of the Defendants are or were Spanish teachers at Avon High School - Defendant Mastoloni, Defendant Kessler, and Defendant Esposito.

38.     The three teachers as a group were nicknamed "Tri-State," presumably because one of them was born in New York, one in New Jersey, and the other in Connecticut.

39.     The three Defendant teachers also spent a lot of time with Defendant Sullivan, a guidance counselor at Avon High School.

40.   Defendant Mastoloni would often act as a "friend" to the students rather than a teacher. She spent much class time "socializing" with the students rather than teaching.

41.   During Spanish class, Defendant Mastoloni often told inappropriate stories to the students.

42.   For instance, Defendant Mastoloni freely discussed her abusive upbringing, including stories of kidnapping and forcible rape by her stepfather.

43.   Defendant Mastoloni would also show the students pictures of her sisters and describe how she hated her youngest sister.

44.   Defendant Mastoloni would often pry into students' personal lives, and try to illicit personal information about them.

45.   Defendant Mastoloni would constantly ask the students in class to tell her who is dating who.

46.   Defendant Mastoloni would ask the students to describe their dreams, so that she could interpret them for the students.

47.   Defendant Mastoloni would frequently talk to the students about her own boyfriends and other personal business.

48.   Defendants Mastoloni, Kessler, Esposito, and Sullivan behaved as if they were in a clique. When they liked a student, they would make that student feel like he or she was part of their group. When they did not like a student, they would ostracize and alienate that student.

49.   Defendants Mastoloni, Kessler, Esposito, and Sullivan would talk about the students they did not like in a derogatory way in front of the other students.

50.   Defendant Mastoloni frequently admonished certain students and sought to embarrass them. She would make fun of them and pick on them in front of their peers.

51.   Defendant Mastoloni picked on one young girl who is normally very happy and gregarious, by singling her out in front of the class and telling her "you're a phony . . . look at you smiling all the time, your smile is fake and you are a phony, no one is always that happy, there is something wrong with you." That student left the room crying.

52.   Defendants Mastoloni, Kessler, Esposito, and Sullivan also sought to alienate the students from other teachers. They would be openly critical of the other teachers in front of the students.

53.   Defendant Mastoloni freely gave students access to her home address and private cell phone number.  Students would go to her house and talk to her frequently and consider her "a friend."

54.   Defendant Mastoloni would experience extreme mood swings while teaching, going through extreme highs and extreme lows.

55.   At times, Defendant Mastoloni would arrive for her classes extremely late.  On some occasions, she would leave the class in the middle for no apparent reason, and would not return.

56.   Defendant Mastoloni frequently gave the students busy work, or showed them movies with no educational value, during which the students would spend the entire period talking to each other.

57.   One time, during the week before finals, when other teachers were reviewing material to prepare the students for their tests, Defendant Mastoloni spent the whole week showing "The Lion King" in Spanish.

58.   On one occasion, Defendant Mastoloni conducted an exercise where the students were told to spend 25 minutes "just talking" to each other to see who could last the longest without daydreaming or "falling out."  During the exercise, Defendant Mastoloni and the students spoke in English, not Spanish.  The exercise was not part of any assignment. Defendant Mastoloni relentlessly encouraged the students to keep talking, and she herself talked non-stop the entire period.  The students complained that they were getting tired of talking so much and wanted to stop, but Defendant Mastoloni said no.

59.   Defendant Mastoloni frequently discussed her ex-husband, who was Italian, in a derogatory way.  She openly discussed her hatred of Italians.

60.   Defendant Mastoloni was not just teaching her students Spanish.  She taught her students religion and pseudoscience.   Specifically, she taught her students to believe in superstition, magic, and a non-scientific, anti-intellectual worldview.  She would discuss spirituality, numerology, astrology, dreams, mysticism, looking for "signs," angels, symbols, "synchronicity," "negativity," "seeking the truth," and death.  All of those topics are religious in nature, and none of those topics are included in the Avon High School curriculum.

61.   Defendant Mastoloni's Spanish class often focused on the topic of death.  One time, Defendant Mastoloni even had the students write about what they thought happened to them when they died.  Because the writings were done in Spanish, people outside the class, especially parents, did not realize what the students were writing.

62.   Defendant Kessler has also used her class time to tell her students stories about the deaths of children.

63.     Defendant Mastoloni once spent about 60-70 minutes of class time discussing her dermoid cyst of the ovary, which she described as having hair and teeth, and then proceeded to show the students a series of videos depicting such cysts.  Neither the discussion nor the videos were in Spanish.  Defendant Mastoloni ate her lunch during the videos.

64.     On information and belief, Defendants Mastoloni, Kessler, Esposito, and Sullivan are adherents of a religious cult that promotes martyrdom, and celebrates death.

**E.D.'s Religious Indoctrination**

65.     E.D. is extremely intelligent and gifted, but socially awkward.

66.     E.D. always related more to adults than to peers her own age.

67.     As a result, E.D. was bullied in elementary and middle school.

68.     This made E.D. apprehensive about starting high school.

69.     When E.D. started high school, she had very limited contact with the other students in her class.

70.     E.D. excelled at languages and was fluent with Spanish since she started studying it in fifth grade.

71.     E.D.'s command of languages caught the attention of Defendants Mastoloni, Kessler, and Esposito, immediately upon beginning freshman year in high school.

72.     During freshman year, E.D. had Defendant Kessler as a Spanish teacher.

73.     E.D. confided in Defendant Kessler about the bullying she experienced and her fear of beginning high school.

74.     Defendant Kessler was reassuring to E.D.   Initially, Defendant Kessler behaved professionally and seemed to have an interest in looking out for E.D.'s best interest at school.

75.     However, E.D. also caught the attention of Defendant Mastoloni.  Defendant Kessler introduced E.D. to Defendant Mastoloni in the faculty room.  After Defendant Mastoloni conversed with E.D. in Spanish, Defendant Mastolini said to E.D., "I like you, we're going to be friends."

76.     E.D. repeated that comment to her mother, Jane.

77. Jane, who is a licensed teacher and licensed school counselor, told E.D. that Defendant Mastoloni's comment was inappropriate because she was her teacher and could not be her "friend."

78. After that, Defendants Mastoloni, Kessler, Esposito, and Sullivan each began to engage E.D. in personal relationships that overstepped appropriate social and professional boundaries.

79. For instance, Defendant Kessler enlisted E.D. to mark her papers and create exams – including midterms and finals.

80. Each of the Defendants, at various times, when they were absent, had E.D. teach their classes instead of the substitute who was hired by Avon High School.

81. Defendant Kessler rewarded E.D. with gifts such as gift certificates and other presents that were not inexpensive.

82. E.D. became the TA (teacher's assistant) for all three Defendant teachers, and remained so until she graduated.

83. All three Defendant teachers utilized E.D. constantly to help fulfill their professional obligations, such as creating tests, and marking papers.

84. On one occasion, the Defendant teachers enlisted the students during multiple periods of classes to hole punch papers in order to "bombard" each other's classrooms with "confetti."

85. When the Defendant teachers were admonished by the administration and custodial staff and told to clean up the mess, they enlisted E.D. to help with the clean up after school.

86. Defendants Mastoloni, Kessler, Esposito, and Sullivan also tried to include E.D. in social activities outside of school.

87. Jane prohibited E.D. from attending, because such activities seemed to cross the boundaries of the teacher/student relationship.

88. Because of her lack of friends, E.D. was very impressionable.

89. Defendants Mastoloni, Kessler, Esposito, and Sullivan took advantage of E.D. by befriending her in words and actions.

90. For instance, Defendant Kessler invited E.D. to her children's birthday parties.

91. On a couple of occasions, the three Defendant teachers and E.D. left school grounds during the school day to have lunch together.

92.   On another occasion, Defendant Mastoloni met E.D. at a local coffee shop with a former student.

93.   The former student admitted to using illegal drugs, specifically hallucinogenic mushrooms.

94.   E.D. was very uncomfortable with the situation and said so to Defendant Mastoloni.

95.   Defendant Mastoloni responded by making E.D. feel immature and unsophisticated. Defendant Mastoloni chastised E.D. for being so "scared."

96.   Although E.D. did not drink alcohol, Defendant Kessler frequently talked to E.D. about drinking, often discussing her episodes of "partying" in college.

97.   Defendants Mastoloni, Kessler, Esposito, and Sullivan also took steps to alienate E.D. from her peers.

98.   For instance, Defendants Mastoloni and Kessler would bring E.D. morning coffee from Starbucks or Dunkin' Donuts while she was in class.  This caused the other students to view E.D. as the teachers' pet.

99.   Defendants Mastoloni, Kessler, Esposito, and Sullivan also took steps to alienate E.D. from other teachers.  At one point, Defendant Kessler discouraged E.D. from being mentored by a well-loved history teacher.  Defendant Kessler told E.D. that the history teacher, who is an African-American male married to a white female, should be with "his own kind."

100.  During sophomore year of high school, E.D. had Defendant Mastoloni as a Spanish teacher.

101.  Defendant Mastoloni consistently proselytized her religious views in the classroom, teaching E.D. and the other students to believe in superstition and magic.

102.  Defendant Mastoloni constantly discussed spirituality, numerology, astrology, dreams, mysticism, looking for "signs," angels, symbols, "synchronicity," "negativity," seeking the "truth," and death.

103.  Jane and John spoke frequently to E.D. about the Defendant teachers' lack of boundaries, and specifically about Defendant Mastoloni's inappropriate engagement with her, although they were unaware that Defendant Mastoloni was teaching religion in the classroom.

104.  As a result, E.D. became more covert in her dealings with Defendants Mastoloni, Kessler, Esposito, and Sullivan.

105. Over time, E.D. began spending more and more time with Defendant Mastoloni at school.

106. Defendant Mastoloni would usually eat lunch with E.D. at school.

107. E.D. described Defendant Mastoloni as not having friends - just like her.

108. Defendant Mastoloni would refer to E.D. as "mi sole hermana."

109. Defendant Mastoloni would frequently exchange dialogue with E.D. via text, phone and email.

110. Often times when Jane or John were picking E.D. up from school, E.D. would come out extremely late.

111. Jane or John would have to enlist the help of their other children to get E.D.

112. E.D. would ultimately be found in Defendant Mastoloni's or Defendant Kessler's classroom, with the Defendant teachers.

113. The Defendant teachers knew that Jane or John were outside waiting to pick up E.D., yet they would deliberately lure E.D. into their classrooms to make her late - not by minutes, but by hours.

114. E.D. would say that she was helping to grade papers, or that she was fulfilling an obligation on her part as TA.

115. On some occasions, either Defendant Mastoloni or Defendant Kessler would drive E.D. home from school after keeping her there late.

116. Defendant Mastoloni's relationship with E.D. was highly manipulative.

117. Defendant Mastoloni would frequently switch between two extremes - showering E.D. with love and affection on the one hand, and giving her the cold shoulder on the other hand.

118. For instance, Defendant Mastoloni would sometimes give E.D. presents and would express deep love and friendship for her.

119. Other times she would be very stand-offish and aloof, which caused E.D. to become very upset thinking she did something wrong.

120. During sophomore year, E.D. had a boyfriend and Defendant Mastoloni began giving E.D. the cold shoulder.

121. E.D. was devastated and did not understand why she was being treated that way.

122.   Defendant Mastoloni would say some particularly cruel things to E.D.

123.   For instance, Defendant Mastoloni would tell E.D. that her boyfriend was not a "man," and that if she wanted to date a "boy" who was immature, that was her business.

124.   Just as quickly as Defendant Mastoloni would be unkind to E.D., she would switch back to being nice, and would make E.D. feel like she was back in her good graces.

125.   E.D. was impacted by Defendant Mastoloni's disapproval of her boyfriend.

126.   After almost a year, they broke up.

127.   After that, Defendant Mastoloni became even more friendly to E.D. than before.

128.   During senior year, after E.D. turned 18, Defendant Mastoloni's attention to E.D. became even more intense.

129.   Defendant Mastoloni said to E.D., "Now that you are 18, mi hermana, you are an adult and we can be friends outside of school."

130.   At that point, Defendant Mastoloni allowed E.D. to "friend" her on Facebook.

131.   Defendant Mastoloni began to initiate several conversations where Defendant Mastoloni was trying to illicit from E.D. specific information about the Doe family members and their family relationships.  Defendant Mastoloni would often engage E.D. in "fishing expeditions," trying to pry information about the Doe home and family.

132.   For instance, the Doe family had gone through three very significant personal events - a death in the family, an illness in the family, and a work-related issue.  Those events created stress for the Doe family.

133.   Defendant Mastoloni took advantage of that opportunity to get even closer to E.D.

134.   Defendant Mastoloni often asked E.D. if she could be invited over to the Doe home for dinner so she could see the house where E.D. lived.

135.   Defendant Esposito was also being inappropriately intrusive.  For instance, he once asked E.D. about the sexual orientation of her siblings.

136.   After graduating high school, E.D. began attending Wellesley College in Massachusetts.

137.   The summer before E.D. began college, her relationship with Defendant Mastoloni intensified.

138.   During that summer, Defendant Mastoloni met E.D. several times to "socialize."

139.   Defendant Mastoloni made numerous derogatory comments to E.D. about her siblings.

140.   At Wellesley, E.D. was assigned a roommate named Naureen.

141.   E.D. immediately became very close with Naureen - until Defendant Mastoloni intervened.

142.   Defendant Mastoloni began frequently contacting E.D.

143.   In November of freshman year, Defendant Mastoloni went to visit E.D. at Wellesley, and spent a weekend at a nearby hotel.

144.   Defendant Mastoloni was very critical about E.D.'s new college "life."

145.   Defendant Mastoloni made E.D. feel inadequate and chided her with comments about her surroundings.

146.   For instance, Defendant Mastoloni made comments about the Wellesley students coming from wealth, and being spoiled.

147.   Defendant Mastoloni chastised E.D. for wanting to take part in "college activities" that seemed very immature to Defendant Mastoloni.

148.   Moreover, Defendant Mastoloni disapproved of E.D.'s roommate, Naureen.

149.   Within a couple of weeks, Naureen had moved out.

150.   Although E.D. claimed that Naureen was verbally abusive and they were no longer friends, that is actually not what happened.

151.   In reality, Naureen became very uncomfortable when she met Defendant Mastoloni.

152.   Within a week of Defendant Mastoloni's visit, E.D. became overly obsessive of Naureen.

153.   One night, E.D. attempted to keep Naureen up all evening by badgering and talking to her, despite Naureen's pleas to leave her alone because she had to study and then go to sleep.

154.   E.D. also badgered Naureen to eat the food she brought her even though Naureen said she had already eaten.  That made E.D. even more angry.

155.   E.D. would turn the lights on when Naureen was trying to sleep and she would invade Naureen's space.

156.    E.D. had never been aggressive towards Naureen before, and this caused Naureen to feel confused, scared and threatened.

157.    As a result, Naureen requested a room change.

158.    E.D. then disparaged Naureen to other peers in the dorm and throughout campus, telling them that Naureen "abused her."

159.    Naureen was so devastated that she needed to seek counseling from the school.

160.    E.D.'s behavior towards Naureen was totally out of character.

161.    Prior to her relationship with Defendant Mastoloni, E.D. had always been kind, gentle and non-threatening.

162.    Defendant Mastoloni continued to meet with E.D. socially during school breaks and summer break.

163.    Defendant Kessler and Defendant Esposito also met with E.D. on a couple of occasions.

164.    One time, while E.D. was home on a break, the Defendant teachers wanted to take E.D. out somewhere.

165.    Jane and John said no.

166.    In response, Defendants Kessler and Esposito came by the Doe home unannounced, to pick E.D. up.

167.    Defendants Kessler and Esposito apparently felt that if they just dropped in, Jane and John would not want to make a scene and would feel obligated to let E.D. go with them.

168.    Defendants Kessler and Esposito invited themselves into the Doe home, barging their way through the door and embarrassing the other Doe kids who had to go into hiding because they were in their pajamas.

169.    In the second semester of sophomore year, E.D. would constantly leave her dorm and would spend all night engaging in "talking" to another girl on campus, Lauren C.

170.    This continued to the point where Lauren C. was becoming sleep-deprived, and started having difficulty attending to her academics - similar to what happened to Naureen.

171.    Unlike Naureen, however, Lauren C. became closer to E.D. and was unable to fend off E.D.'s advances.  This behavior continued for the entire semester.

172. E.D. and other girls would frequently go to Alumni Hall where it was desolate and they would dance, sing and perform "whirling dervishes" - religious dances - until the wee hours of the morning.

173. By the end of her sophomore year, E.D. was showing signs of a marked change in personality.

174. E.D. was becoming reclusive and non-communicative, traits that were out of character for her.

175. E.D.'s new personality was a direct result of the religious indoctrination she had been subjected to by Defendants Mastoloni, Kessler, Esposito, and Sullivan.

176. E.D. underwent another phase of her personality change in August of 2012, when she was entering her junior year in college.

177. At that time, Defendant Mastoloni again honed in on E.D.

178. Defendant Mastoloni would constantly be looking to go out with E.D. socially.

179. Defendant Mastoloni brought E.D. into her home.

180. E.D. told Jane and John that she wanted to attend Defendant Mastoloni's graduation from some type of school where Defendant Mastoloni was receiving a degree in "spirituality."

181. Defendant Mastoloni claimed it was a "masters" in "conscious evolution."

182. Yet, when Jane and John asked E.D. for the name of the school, E.D. claimed she did not know.

183. Then, E.D. suddenly declared that her major would be philosophy, instead of political science or international relations like she originally decided.

184. E.D. also announced that she wanted to seek a masters in Divinity following graduation from Wellesley.

185. E.D. was unable to offer any real explanation for her sudden interest in religion.

186. At this point, E.D. would become nervous when talking with her parents, and she did not respond well to any questions or discussions.

187. E.D. was having trouble "thinking" to the point that she would cry and say she had trouble putting her thoughts to paper.

188. E.D. always had a great deal of work to do and was often irritable and emotional.

189.   E.D. began to isolate herself a bit more from the family to "read" and spent a lot of time on her laptop.

190.   Moreover, E.D.'s language seemed different.

191.   E.D. was constantly talking about "seeking the truth" and pursuing a "greater purpose."

192.   All of E.D.'s conversations involved Defendant Mastoloni.

193.   E.D. no longer engaged in ordinary verbal banter or back-and-forth discussion.

194.   Rather, E.D. would make statements that did not make sense to anyone else, and she would get angry at anyone who asked for clarity.

195.   E.D. no longer appreciated anyone else's opinion.

196.   E.D. also lacked humor.

197.   Jane began to notice a very odd and pungent odor coming from E.D.'s room.

198.   The odor was very distinct and enmeshed in all of her clothes.

199.   Yet, it was not the smell of any kind of drug that Jane was aware of, even though she is professionally trained to recognize such smells.

200.   In the first semester of junior year at Wellesley, E.D.'s personality change became even more drastic.

201.   E.D. used to be extremely close with her mother, Jane.

202.   E.D. often talked freely with Jane and would call daily.

203.   Now E.D. began to distance herself from Jane.

204.   E.D. stopped returning phone calls or responding to text messages from Jane.

205.   When E.D. came home for Thanksgiving, it was the first time that Jane and John had seen her since bringing her to campus in August.

206.   At that point, E.D. was displaying overt signs of an altered personality.

207.   E.D. was flat, humorless and she looked at family members strangely, keeping her distance.

208.   E.D. behaved rudely towards her friends, often calling them "superficial" and accusing them of not following their "passions."

15

209.   When confronted by her family about her disturbing behavior, she gave an evasive answer, "You don't understand the person I have become."

210.   When asked what that meant, E.D. was unable or unwilling to offer any explanations, nor would she engage in any dialogue, which was out of character for her.

211.   When Jane or John inquired of E.D. as to how her other friends were doing at school, E.D. would become very insolent and exclaim they were fine.

212.   As it turns out, E.D.'s friendship with Lauren C. had fallen apart much like E.D.'s friendship with Naureen had a couple of years earlier.

213.   E.D.'s other friendships had deteriorated as well – except for her friendships with Defendants Mastoloni, Kessler, Esposito, and Sullivan.

**L.D.'s Religious Indoctrination**

214.   When E.D.'s sister L.D. signed up for an advanced Spanish class for her senior year of high school, she was assigned to Defendant Mastoloni's class, because Defendant Mastoloni was the only teacher for the more advanced students. That caused L.D. to become despondent and anxiety-ridden for the entire summer.

215.   As Defendant Mastoloni had done for years before, she consistently proselytized her religious views in the classroom, teaching L.D. and the other students to believe in superstition and magic.

216.   Defendant Mastoloni constantly discussed spirituality, numerology, astrology, dreams, mysticism, looking for "signs," angels, symbols, "synchronicity," "negativity," seeking the "truth," and death.

217.   While in Defendant Mastoloni's class, L.D. began to undergo a personality change.

218.   For the first time ever, she would become testy and disrespectful towards her mother.

219.   At the same time, L.D.'s feelings towards Defendant Mastoloni began to change.

220.   L.D. went from not liking Defendant Mastoloni to establishing a friendship with Defendant Mastoloni, similar to the relationship that E.D. had with Defendant Mastoloni.

221.   L.D. also began engaging her sister E.D. in extended conversations about Defendant Mastoloni.

222.   E.D. and L.D. began to compete for Defendant Mastoloni's affection.

223.   Defendant Mastoloni would make comments about one sister to the other.  At one time, Defendant Mastoloni told E.D. that L.D. "is even better than you!"

224.   Defendant Mastoloni used her position as L.D.'s teacher to begin indoctrinating L.D. into the same religion that she had previously indoctrinated E.D. into.

225.   Defendants Mastoloni, Kessler, Esposito, and Sullivan began to use E.D. to assist with the religious indoctrination of L.D.

226.   For instance, L.D. was initially reluctant to go to the same college as her sister.

227.   However, Defendant Sullivan urged L.D. to go to Wellesley to be with her sister, presumably because it would make it easier for Defendants Mastoloni, Kessler, Esposito, and Sullivan to keep the two sisters indoctrinated if they were together.

228.   As a result of Defendant Sullivan's urging, L.D. ultimately decided to attend Wellesley.

229.   When E.D. and L.D. both came home for Christmas break in 2012, they were closer to each other than they had previously been, and they began isolating the rest of the family.

230.   There were episodes of erratic behavior in both daughters where they would be disrespectful.

231.   They frequently used the same language that Defendant Mastoloni used such as "negativity," "synchronicity," and "seeking the truth."

232.   They also had developed a fascination with dreams, astrology, and "symbols."

233.   In January 2013, when E.D. was to turn 21, the Defendant teachers offered to take E.D. out drinking.

234.   Jane and John expressed their disapproval and E.D. did not go.

235.   E.D. and L.D. returned to Wellesley at the end of January 2013.  Between that time and the third week in March there were significant changes.

236.   On information and belief, Defendant Mastoloni visited E.D. and L.D. at Wellesley during that time.

237.   L.D. began calling her parents much less frequently.

238.   The conversations that L.D. did have were superficial and sporadic.

239.   On the few occasions when Jane was able to reach E.D. or L.D., Jane would ask what was wrong.

240. E.D. and L.D. would respond with robotic answers such as "I am not comfortable having this conversation."

241. E.D. and L.D. no longer had any interest in chatting about what was going on in the daily lives of family members.  They now considered such chatter to be "gossiping."

242. E.D. and L.D. returned home for spring break the third week in March 2013.  At that time, they each exhibited a dramatic change in personality.

243. Neither daughter spoke to John the whole ride home nor did they acknowledge Jane the way they usually did.

244. Their demeanor was flat, distant, and at times, even fearful.

245. They spent every minute of every day with each other and excluded the rest of the family.

246. E.D. and L.D. were inseparable, which was highly unusual.

247. E.D. and L.D. would have breakfast together and exclude Jane from all conversation.

248. From morning until dinner, E.D. and L.D. would be on their laptops and reading books together.

249. Sometimes, they would leave the house to go for "walks" without even saying they were leaving, and be gone for hours.

250. They would not engage in any discussion, except to discuss Defendant Mastoloni.

251. Both E.D. and L.D. visited Defendant Mastoloni at Avon High School while they were home on break.

252. In May 2013, a former student of Defendant Mastolini confided in Defendant Mastoloni and E.D. that she had been raped during her first year of college and would be transferring to a new school.

253. After the girl left, Defendant Mastoloni said to E.D., "don't believe her, she is probably being dramatic . . . don't concern yourself with the negative."

254. E.D. reiterated the story to her sister L.D.

255. The girl who was raped had been a close friend of L.D. since fourth grade.

256. Yet, after hearing the story, L.D. exhibited no empathy for the rape victim.

257. Instead, L.D. remarked "I love that woman," referring to Defendant Mastolini.

258.   L.D.'s opinion of Defendant Mastoloni was completely opposite of the way she felt a few years earlier, when L.D. had cried upon learning that she had Defendant Mastoloni as a teacher.

259.   By this time, both E.D. and L.D. seemed to have lost their ability to feel empathy for anyone other than Defendants Mastoloni, Kessler, Esposito, and Sullivan.

260.   Both E.D. and L.D. were fully indoctrinated by now into the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

261.   As a result of their religious indoctrination, E.D. and L.D. began to engage in fantasies of martyrdom and suicidal ideation.

**J.D.'s Religious Indoctrination**

262.   In spring semester 2013, the Doe's youngest child, J.D., was 15 and had Defendant Mastoloni as a Spanish teacher.

263.   J.D. became uncomfortable with Defendant Mastoloni's behavior as a teacher, which was sometimes very intense and at other times very lax.

264.   Once again, Defendant Mastoloni consistently proselytized her religious views in the classroom, teaching J.D. and the other students to believe in superstition and magic.

265.   Defendant Mastoloni constantly discussed spirituality, numerology, astrology, dreams, mysticism, looking for "signs," angels, symbols, "synchronicity," "negativity," seeking the "truth," and death.

266.   Although Defendant Mastoloni would preach her religious ideas to the whole class, she took a special interest in J.D.

267.   Defendant Mastoloni had already converted the two older Doe sisters, and now she was looking to add the third sister to her coven.

268.   Defendant Mastoloni repeatedly directed negative attention towards J.D. in an effort to break her down psychologically.

269.   For instance, Defendant Mastoloni called J.D. into the hall in front of all her classmates, and admonished her for getting a "C" on a test.

270.   Defendant Mastoloni was relentless in her chiding of J.D.

271.   Defendant Mastoloni expressed her displeasure with J.D.'s grade, stated how disappointed she was, and warned her she better improve.

272.   J.D. was so upset that she ended up crying in the bathroom after class.

273.    As it turned out, many students did not do well on the test and there were many "C's".

274.    Yet, J.D. had been singled out and publicly humiliated.

275.    In another incident, after Defendant Mastoloni learned from E.D. that J.D. took vocal lessons, Defendant Mastoloni invited J.D., without warning, to sing in class and in front of her peers.

276.    Naturally, J.D. resisted.

277.    Again, Defendant Mastoloni was relentless.

278.    Defendant Mastoloni made the other students insist on J.D. singing until J.D., feeling pressured, eventually obliged.

279.    Defendant Mastoloni would frequently discuss the dynamics of the class and its students with J.D.'s older sister E.D., which made J.D. very uncomfortable.

280.    Even worse, Defendant Mastoloni often discussed J.D.'s academic performance with E.D., in violation of J.D.'s privacy.

281.    For instance, Defendant Mastoloni told E.D. about the "C" that J.D. had received on her test.

282.    Defendant Mastoloni also showed E.D. a paper that J.D. wrote for Defendant Mastoloni's class.

283.    J.D. had written an essay in Spanish discussing her New Year's Resolutions.

284.    Although the essay was personal, and was intended to be seen only by the teacher, Defendant Mastoloni nevertheless shared it with E.D.

285.    J.D. experienced embarrassment and humiliation when E.D. subsequently approached J.D. about the paper, at Defendant Mastoloni's direction.

286.    In March 2013, the day before E.D. and L.D. were to return to Wellesley from spring break, they suddenly took a keen interest in J.D.

287.    At Defendant Mastoloni's urging, E.D. and L.D. asked J.D. to come to Wellesley during her April break, luring her there by telling her that they would take her to a music concert.

288.    J.D. was looking forward to seeing if she could find out some information that would reveal the cause of E.D.'s and L.D.'s bizarre behavior.

289.    J.D. was excited about the opportunity to find out what she could discover, because she was as baffled as her parents about her sisters' sudden changes in personality.

290.    J.D. had expected to be staying in L.D.'s dorm, because L.D. had a spare bed.

291.    Yet, the day before J.D. was set to leave, she learned that E.D. and L.D. were planning on having J.D. stay in E.D.'s dorm, where she would have to sleep on the floor.

292.    Jane disapproved of those arrangements, and was met with hostility and impatience from E.D., until E.D. conceded and allowed J.D. to stay with L.D.

293.    When Jane and John dropped off J.D. at Wellesley, they gave their daughters money for the week.

294.    E.D. indicated that she wanted to spend the money immediately and wanted to ask for more.  That was very uncharacteristic of E.D.  Yet, E.D. had been uncharacteristically asking for money more and more often.

295.    While J.D. was staying with E.D. and L.D., the Boston Marathon bombing occurred.

296.    The Doe daughters were supposed to be in the area at the time, so naturally Jane and John were worried.

297.    Yet, the Doe daughters would not respond to Jane's calls or texts.

298.    It was hours before Jane finally heard that their daughters were okay.

299.    E.D. and L.D. acted impatient with Jane, and wanted to know what was the "big deal."

300.    Despite the gravity of the event, they seemed unmoved by the injuries, loss of life and enormity of what had happened.  They were exhibiting little to no empathy.

301.    During that week, not only did E.D. and L.D. not communicate with Jane and John, but J.D. ceased communication as well.

302.    Despite Jane explicitly telling them that J.D. must remain in touch with her daily (after all, she was only 15), the daughters demonstrated a complete lack of regard for their mother's instructions.

303.    Any conversations that J.D. did have with Jane were extremely brief and hurried.

304.    When J.D. returned after that week, she was cold, lacked affect, and was behaving just like E.D. and L.D.

305.    J.D. would go to her room after school, did not feel like talking, and spent as little time with Jane and John as possible.

306.  However, J.D. did spend time talking and texting with her sisters, which was very out of the ordinary.

307.  J.D.'s whole personality had changed.  There was no more gregarious laughter and joking around.  Instead, J.D. was flat, serious and isolating.

308.  When Jane and John asked J.D. if she uncovered any information pertaining to her sisters' personality changes, J.D. responded by saying, "I'm uncomfortable having this conversation."

309.  That was the same line that E.D. and L.D. had been using to respond to Jane's questions.

310.  E.D. and L.D. refused to talk to Jane and John and avoided them unless they needed to call for money or had a reason to call for something specific.

311.  One day J.D.'s vocal coach called Jane and John, very concerned about J.D.'s behavior.

312.  J.D. was unusually quiet and not as friendly as usual.

313.  Moreover, J.D. expressed to her vocal coach that her parents were not supportive of her desire to pursue music.

314.  The coach thought this was very out of character, because she knew how very supportive Jane and John are of J.D. and of all their kids.

315.  When Jane questioned J.D. about it, J.D. became confrontational.

316.  When Jane called E.D. to inquire about what was going on with J.D., Jane felt it was like talking to a stranger.

317.  E.D. was rude, hurtful, scornful, and incoherent.

318.  The things E.D. said were similar to the things Defendant Mastoloni would say.

319.  For instance, E.D. was talking about "negativity" and "toxicity," specifically accusing Jane of being "toxic."

320.  Then E.D. made Jane promise not to share their conversation with John.

321.  E.D. made Jane feel guilty that somehow Jane did not understand her own daughter.  This caused Jane to weep - for days.

322.  The bizarre behavior of all three daughters continued.

323.    When E.D. and L.D. came home from school at the end of May 2013, all three daughters were isolating and fearful.

324.    They spent countless hours on their laptops, or reading books about mysticism, astrology, dreams, and Carl Jung.

325.    E.D. and L.D. isolated Jane and John, and only spent time with each other.

326.    E.D. was extremely confrontational, and filled with rage.

327.    L.D. didn't speak anymore, except to E.D.  If someone would address L.D., E.D. would answer for her.

328.    Eventually, John took L.D. back to Wellesley for a summer class.  John tried to speak to L.D. during the trip, but she refused.

329.    E.D. was nervous about being separated from L.D. for such a long time, so she concocted a story about having an obligation on campus so that she could return to Wellesley while L.D. was there.

330.    With E.D. and L.D. gone, Jane had an opportunity to isolate J.D.

331.    After much time crying and pleading and talking, Jane was finally able to break through to J.D.

332.    Jane saw J.D. experience a sudden psychological release, which was reflected in J.D.'s facial expression.

333.    At that moment, Jane knew that J.D. had snapped out of the indoctrination.

334.    At that point, J.D. began crying uncontrollably.  She held Jane tight and kept saying "what's happening?"

335.    Over the next several days, weeks, and months, Jane and John worked with J.D. to process what had happened to her.  J.D. began to reveal the details of what had occurred.

336.    Jane and John learned that J.D. did not attend any concert while she was visiting her sisters at Wellesley.

337.    For the entire week she was there, J.D. was under the total and constant control of her sister, E.D., who was acting at the direction of Defendant Mastoloni.

338.    E.D. had honed in on J.D. in much the same way that she had done with Naureen and Lauren C.

339.    In doing so, E.D. barraged J.D. with thoughts that turned J.D. against her parents.

23

340.   E.D. also told J.D. that J.D. needed to rid her life of poisonous relationships, including her relationship with their mother, who was "narcissistic."

341.   E.D. told J.D. that their parents did not love J.D. and that they did not support J.D.'s dreams to be a musician.

342.   E.D. told J.D. that J.D. did not need her parents and that E.D. and L.D. would be there for her.

343.   E.D. also tried to turn J.D. against her vocal coach, insisting that J.D. use Defendant Mastoloni as a vocal coach instead.

344.   At one point, E.D. isolated J.D., and made her sing in front of an empty auditorium - or so J.D. thought.   It turned out that people were really there, causing J.D. to feel embarrassed and vulnerable.

345.   E.D. also said demeaning things about J.D. to make her feel self-conscious, including things about J.D.'s laugh, and her weight.

346.   E.D. did not leave J.D.'s side the entire visit.

347.   E.D. also deprived J.D. of sleep and kept her uncontrollably tired.

348.   Most importantly, however, J.D. revealed how Defendant Mastoloni had orchestrated the entire ordeal.

349.   In fact, E.D. was on the phone with Defendant Mastolini for long periods of time while J.D. was there.

350.   After J.D. returned from Wellesley, Defendants Mastoloni, Kessler, Esposito, and Sullivan used E.D. and L.D. to relentlessly maintain and intensify their control over J.D.

351.   E.D. began making bizarre comments to J.D., in an effort to reorganize J.D.'s thinking.

352.   For instance, E.D. discussed with J.D. how education was not that important.

353.   E.D. told J.D. that she did not want to have children, but that she wanted to give birth to feel the pain.

354.   E.D. also told J.D. that she did not want to get married, but if she lived with someone they would have separate bedrooms with one room being strictly for sex.

355.   At one point, E.D. tried to convince J.D. that she could live with E.D. and L.D. in Boston when she graduates high school.

356.  Had E.D. not chosen to return to Wellesley to be with L.D., Defendants Mastoloni, Kessler, Esposito, and Sullivan would not have lost control over J.D., and they would still be actively working to keep J.D. indoctrinated.

357.  It was not until J.D. broke free that Jane and John understood that their three daughters had been subjected to religious indoctrination at Avon High School.

**The Defendants Retaliate By Removing E.D. and L.D. From The Doe Home For Good**

358.  During the course of their indoctrination, E.D. and L.D. were made to believe that their parents were "abusive."

359.  Defendants Mastoloni, Kessler, Esposito, and Sullivan successfully planted false memories of parental abuse into the minds of E.D. and L.D.

360.  When E.D. and L.D. returned home after the 2013 summer session, at the end of June or beginning of July, they continued to isolate the rest of the family.

361.  E.D. and L.D. would spend all of their time on their laptops or reading astrology or mysticism materials.

362.  E.D. and L.D. did not speak to Jane and John.

363.  E.D. and L.D. now realized that J.D. was "broken."   They ignored her and at times would make hurtful comments to her.

364.  One day Jane and John decided to try again to have a discussion with L.D.

365.  E.D. became confrontational and L.D. was like a "zombie."

366.  Jane and John told them that they would no longer tolerate being isolated, and that they wanted E.D. and L.D. to spend time with them and take part in family activities.

367.  E.D. became enraged.

368.  J.D. was terrified.

369.  As Jane and John attempted to speak directly to L.D., E.D. became increasingly more upset that she was not being allowed to speak for her sister.

370.  E.D. tried to slam clothes hangers into John's chest as he was trying to speak to L.D.

371.  John almost lost his balance and fell.

372.  The following morning, E.D. and L.D. came charging down the stairs and flew out the front door.  They got into a car with Defendant Mastoloni.

373.   E.D. and L.D. did not return until ten at night, at which time they sped up the stairs and to their room.

374.   The next day, E.D. and L.D. left with Defendant Mastoloni again.

375.   As it turned out, on information and belief, Defendants Mastoloni, Kessler, Esposito, and Sullivan had hatched a plan for E.D. and L.D. to move out of the Doe house for good.

376.   The plan involved relocating E.D. and L.D. to housing at Wellesley.

377.   On July 12, 2013, E.D. and L.D. left the Doe home with scant belongings.  They did not take any of their dorm room items.  They took limited clothing, no money, no credit cards, and no items of sentimental value.  They left behind fully packed suitcases of winter clothing, a great majority of their shoes, boots, and coats, and all of their toiletries, sheets, and towels.  L.D. took her passport and birth certificate.

378.   At the same time, E.D. bailed out from her summer internship without even communicating with the woman who hired her.

379.   E.D. and L.D. stayed with Defendant Mastoloni until their living quarters at Wellesley were ready.

380.   On information and belief, Defendants Kessler and Esposito were also at Defendant Mastoloni's house while E.D. and L.D. were there.

381.   On information and belief, Defendants Mastoloni, Kessler, Esposito, and Sullivan all knew where E.D. and L.D. were, and each of them concealed that information from Jane and John.

382.   When E.D. called Jane and John on July 12, 2013, E.D. stated that she and L.D. were presently at Wellesley, even though, at that time they were still at Defendant Mastoloni's house.

383.   After E.D. and L.D. stayed with Defendant Mastoloni for two and a half days, Defendant Mastoloni drove them both to Wellesley.

384.   However, because neither E.D. nor L.D. were enrolled as students at Wellesley at that time (since L.D.'s summer class was now over), neither of them was eligible for housing on campus.

385.   Neither E.D. nor L.D. had any means to obtain their own house or apartment.

386.   Therefore, Defendant Mastoloni conspired with Defendants Kessler, Esposito, and Sullivan to fraudulently obtain housing for E.D. and L.D. at Wellesley.

387.  Specifically, on information and belief, Defendants Mastoloni, Kessler, Esposito, and Sullivan fabricated a story about E.D. and L.D. being abused by Jane and John, so that they could claim that they were forced to move out of their parents' home, and were now homeless.

388.  On information and belief, Defendants Mastoloni, Kessler, Esposito, and Sullivan instructed E.D. and L.D. to appeal to Wellesley College to provide them with housing for the remainder of the summer, by falsely claiming that they were homeless abuse victims.

389.  Defendants Mastoloni, Kessler, Esposito, and Sullivan knew that there was no abuse in the Doe family.  This is evidenced by the fact that Defendants Mastoloni, Kessler, Esposito, and Sullivan have never reported any such abuse, even though schoolteachers and guidance counselors are mandatory reporters of such abuse.

390.  Moreover, Defendants Mastoloni, Kessler, Esposito, and Sullivan each knew that E.D. and L.D. were not, in fact, homeless.  To the contrary, Defendants Mastoloni, Kessler, Esposito, and Sullivan each knew that E.D. and L.D. came from a loving home in which Jane and John would have welcomed them back with open arms at any time.

391.  Nevertheless, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

392.  As a result, Wellesley College provided E.D. and L.D. with summer housing that they were not entitled to.

393.  Meanwhile, on July 13, 2013, Jane sent a Facebook message to Defendant Kessler to say she wanted to talk to her regarding E.D.  A Facebook receipt indicated that Defendant Kessler read the message, but yet Defendant Kessler did not reply.

394.  Jane also sent an email to Defendant Sullivan, expressing extreme urgency.  Yet, Defendant Sullivan did not reply.

395.  Jane then called Defendant Kessler's home and spoke with Defendant Kessler's husband, who was very cold and aloof.

396.  Several hours later Defendant Kessler sent a message to Jane saying that she was sorry if Jane had any kind of a "situation," but as an employee of Avon Public Schools, she did not wish to get involved.

397.  At that point, of course, Defendant Kessler was already involved.  Nevertheless, Defendant Kessler was unwilling to assist Jane and John.

398.  E.D. and L.D. were now living at Wellesley, after having left with no bedding, clothes, toiletries, blankets, towels, phone, food, or money.  All of the campus food sources were closed for the summer, so food would have had to have been acquired off-campus.  On

information and belief, Defendants Mastoloni, Kessler, Esposito, and Sullivan are bankrolling them - or else they know who is.

399.    After arriving at Wellesley, E.D. and L.D. unfriended and blocked all social media access for Jane, John, J.D., and other friends and relatives, including all of their friends from Avon, Connecticut.

400.    Since July 12, 2013, E.D. and L.D. have had almost no communication with the rest of the Doe family.

401.    On August 4, 2013, E.D. sent Jane an email asking her parents to let her and L.D. go.

**Defendants Retaliate Against J.D.**

402.    After J.D. broke free from the influence of Defendants Mastoloni, Kessler, Esposito, and Sullivan, Defendant Sullivan began retaliating against J.D. and the Doe family.  This was extremely troubling for J.D., because Defendant Sullivan was J.D.'s guidance counselor.

403.    For instance, even though Jane had sent Defendant Sullivan an urgent message in July 2013, Jane did not hear from Defendant Sullivan until September 2013.  When Defendant Sullivan called John's cell phone, she did not show any concern for the Doe family, and she did not ask if everything was okay, despite the urgency of the message that Jane had previously left her.

404.    In that phone call, John directed Defendant Sullivan to call Jane at her office.  Jane waited for the call that never came.

405.    Instead, Defendant Sullivan called Jane's cell phone and left a message.  Although Jane called her back several times, Defendant Sullivan never responded.

406.    When J.D. asked Defendant Sullivan to let her drop Spanish from her schedule, Defendant Sullivan responded by trying to persuade J.D. to take Spanish with Defendant Kessler, even though Defendant Kessler had been intimately involved in the events that led J.D.'s sisters to leave home and cut off their communication with the Doe family.

407.    When J.D. asked Defendant Sullivan to drop another class in January 2014, Defendant Sullivan insisted that J.D. stop by her office to discuss the matter, even though such course changes are generally made electronically and do not need to be done in person.

408.    Moreover, in January 2014, Defendant Sullivan attempted to lure J.D. into a private meeting with her after Jane and John had expressly told Defendant Sullivan that they did not want Defendant Sullivan to have any meetings with J.D. without Jane and John being present.

409.    To make matters worse, Defendant Sullivan and Defendant Kessler seemed to poke fun at J.D. every chance they got.

410. During J.D.'s junior year of high school, when J.D. should have already begun planning for college, Defendant Sullivan failed in her duties by not apprising J.D. of benchmark obligations throughout the college application process.

411. Moreover, J.D. needed a recommendation letter from a guidance counselor to support her college applications.  Defendant Sullivan was not willing to cooperate in that regard.

412. This placed J.D. in a precarious situation.  Her ability to get into college rested in the hands of one of the same people who tried to indoctrinate her, and who ultimately turned her sisters against her family.

**Defendants Concealed Their Wrongful Conduct to Defeat the Statute of Limitations**

413. Defendants Mastoloni, Kessler, Esposito, and Sullivan actually worked to conceal their wrongful conduct from the Plaintiffs.

414. Specifically, they instructed E.D. and L.D., and later J.D., not to tell their parents what they were learning or doing.

415. They taught E.D. and L.D., and later J.D., to isolate themselves from the rest of their family, so that their family would not be able to figure out what was going on.

416. They taught E.D. and L.D., and later J.D., to evade questions from their parents with non-responses such as "I'm uncomfortable having this conversation."

417. Defendants Mastoloni, Kessler, Esposito, and Sullivan understood that if they prevented Jane and John from learning what was happening to their children until a few years after each child turned eighteen, they could use the statute of limitations to defeat any parental claim brought by Jane and John arising out of their actions.

418. Although the alienation of E.D. and L.D. from their parents occurred on July 12, 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan had enough influence over E.D. and L.D. to alienate them from their parents years earlier than that.

419. Yet, they chose to wait until E.D. was three years out of high school and L.D. was one year out of high school.

420. They likely were intending to wait longer than that – until J.D. was a few years out of high school – before bringing about the alienation of the Doe sisters from their parents.

421. However, the sudden deconversion of J.D. posed a threat to Defendants Mastoloni, Kessler, Esposito, and Sullivan, which caused them to pull the trigger on the alienation immediately, rather than waiting any longer.

422.   Nevertheless, prior to the alienation occurring on July 12, 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan had successfully concealed from all three Plaintiffs the fact that such alienation was part of their agenda.

423.   They had also concealed the fact that, prior to July 12, 2013, they had planted false memories of abuse in the minds of E.D. and L.D., which laid the groundwork for the alienation on July 12, 2013.

424.   They also successfully concealed from Jane and John the fact that they were subjecting E.D., L.D. and J.D. to religious indoctrination.

425.   Jane and John did not learn of the religious indoctrination until J.D. broke free from the indoctrination in June 2013.

426.   Jane and John did not realize that alienation was part of the Defendants' agenda until the alienation occurred on July 12, 2013.

427.   The reason Defendants Mastoloni, Kessler, Esposito, and Sullivan concealed their efforts at alienation and religious indoctrination until July 12, 2013 was because they reasonably believed that they could be sued by Jane and John unless enough time had passed for them to utilize a statute of limitations defense.

428.   Defendants Mastoloni, Kessler, Esposito, and Sullivan each had actual awareness of the facts relating to their wrongful conduct, since they were each personally involved in the wrongful conduct.

429.   Specifically, they were each involved in the predatory religious indoctrination of E.D., L.D., and J.D., and the alienation of E.D. and L.D., and the attempted alienation of J.D.

430.   They each intentionally concealed the facts of their wrongful conduct from the Plaintiffs for the purpose of delaying the Plaintiffs' filing of a lawsuit to address their wrongful conduct.

431.   Thus, Defendants Mastoloni, Kessler, Esposito, and Sullivan engaged in fraudulent concealment in an effort to defeat the statute of limitations.

**Defendants Mastoloni, Kessler, Esposito, and Sullivan Are Not Entitled to Immunity**

432.   The complained of conduct committed by Defendants Mastoloni, Kessler, Esposito, and Sullivan was not discretionary.

433.   To the contrary, public school employees have no discretion to indoctrinate students under their care with religion, to harass students under their care, to retaliate against students under their care for rejecting their religion, to plant false memories of parental abuse into the minds of students under their care, to alienate students under their care

against their parents, or to interfere with, undermine, or terminate the relationships between students under their care and their families.

434.    Put another way, the obligations of public school employees to refrain from indoctrinating students under their care with religion, harassing students under their care, retaliating against students under their care for rejecting their religion, planting false memories of parental abuse into the minds of students under their care, alienating students under their care against their parents, or interfering with, undermining, or terminating the relationships between students under their care and their families, are ministerial duties for which no judgments are permitted.

435.    The ministerial nature of the duties at issue are established in the federal and state constitutional and statutory law cited with respect to the various causes of action within this First Amended Complaint.

436.    Even if Defendants Mastoloni, Kessler, Esposito, and Sullivan did have some discretion, their conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.  More specifically, just about everyone knows, even people who are not employed in public schools, that public school employees are not permitted to indoctrinate students under their care with religion, to harass students under their care, to retaliate against students under their care for rejecting their religion, to plant false memories of parental abuse into the minds of students under their care, to alienate students under their care against their parents, or to interfere with, undermine, or terminate the relationships between students under their care and their families.

437.    Moreover, the practice of Defendants Mastoloni, Kessler, Esposito, and Sullivan of indoctrinating students under their care with religion, harassing students under their care, retaliating against students under their care for rejecting their religion, planting false memories of parental abuse into the minds of students under their care, alienating students under their care against their parents, and interfering with, undermining, and terminating the relationships between students under their care and their families, and the failure of Defendant Avon Public Schools to prevent such conduct with proper training and supervision of its employees, poses an imminent harm to the students at the school, and their parents, all of whom constitute identifiable victims.

438.    Finally, the conduct of Defendants Mastoloni, Kessler, Esposito, and Sullivan involved malice, wantonness, and intent to injure the Plaintiffs.

439.    Therefore, the Defendants are not entitled to immunity under federal or state law.

**Defendant Avon Public Schools Is Subject to *Monell* Liability**

    **A.**    **General Allegations Relating to *Monell* Liability**

440.    All of the complained of actions and omissions of Defendants Mastoloni, Kessler, Esposito, and Sullivan were done within the scope of their respective employment with Defendant Avon Public Schools.

441.    Defendant Avon Public Schools was deliberately indifferent to the likelihood that the violations of federal constitutional and statutory rights described in this First Amended Complaint would occur.

442.    Defendant Avon Public Schools failed to adopt and fund policies and training programs that would ensure that Defendants Mastoloni, Kessler, Esposito, and Sullivan refrained from:

    1)    establishing inappropriate relationships with their students;

    2)    indoctrinating students under their care with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan;

    3)    planting false memories of parental abuse into the minds of students;

    4)    alienating students under their care from their family members;

    5)    harassing students under their care;

    6)    retaliating against students under their care who rejected the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan;

    7)    disclosing students' class work and grades to anyone other than the student and her parents; and

    8)    concealing such activities from the parents of students.

443.    Such policies and training programs are obviously necessary because of the intimate relationships that often form between students and their teachers or guidance counselors, and the natural temptation for untrained teachers and guidance counselors to exploit those intimate relationships.

    **B.**    **The Board Was On Notice That Defendant Sullivan Had a Propensity for Unconstitutionally Breaking Up Families By Making False Allegations of Abuse**

444.    In 2010, Defendant Sullivan subjected another family to the same type of abuse that she subjected the Doe family to.

445.    In that case, Defendant Sullivan indoctrinated two siblings with false memories of abuse by their father.

446.    Defendant Sullivan persuaded the two siblings to turn against their father.

447.    Defendant Sullivan filed a false abuse report against the father with the Connecticut Department of Children and Families ("DCF").

448.    Pursuant to Board policy, a copy of that report was submitted to the Board.

449.    Defendant Sullivan made those false allegations, and the Board allowed it, notwithstanding the fact that there were numerous employees of Avon High School – particularly athletic coaches – who knew the family well, and were aware that the father loved his children and was not abusive towards them.

450.    Based on the false allegations made by Defendant Sullivan, DCF removed the two siblings from their father's home.

451.    A year later, the father was exonerated in court.

452.    The court found that there was no basis to Defendant Sullivan's allegations of abuse, and that the children should have never been removed from the home.

453.    By that time, the two children had been so indoctrinated by Defendant Sullivan to believe they were abused that they refused to return home even after their father was exonerated.

454.    As a result, the father has not had any contact with either of this two children in the last four years.

455.    On information and belief, after the father was exonerated, the Board took no action to discipline Defendant Sullivan.

456.    On information and belief, after the father was exonerated, the Board took no action to retrain Defendant Sullivan so that she would learn how to conduct accurate abuse investigations, or so that she would learn to refrain from making suggestions of abuse to minors which cause them to develop false memories of abuse.

457.    The failure to discipline or retrain Defendant Sullivan reflects a policy of deliberate indifference towards the constitutional rights of students and parents in the school district.

458.    As a further illustration of the Board's deliberate indifference to the constitutional rights of students and parents, the chair of the Board – Peggy Roell – chose to become Facebook friends with one of the children (who is now an adult) who remains alienated from the exonerated father.

33

459.   Ms. Roell has not ever used her friendship with the young man to try to bring about a reconciliation between him and his father, or to otherwise repair the damage that Defendant Sullivan caused while acting within the scope of her employment with Avon High School.

460.   The Facebook friendship between Ms. Roell and the young man only came to an end sometime at or around August 15, 2014, well after this litigation had begun.

461.   The practice of breaking up families by reporting false abuse allegations is a violation of the constitutional rights of each of the family members so affected.

462.   Those constitutional rights were clearly established and known to a reasonable person at all times relevant to this First Amended Complaint.

   **C.**   **The Board Has a Policy or Custom of Prohibiting Complaints About Abusive Employees From Being Made Directly to the Board, Thereby Keeping the Board Willfully Ignorant of Constitutional Violations That Are Known to Employees, Parents and Students Within the School District**

463.   The Board has a policy or custom of prohibiting anyone with knowledge of an abusive employee from making complaints directly to it, except in very limited circumstances.

464.   When a parent calls up the Board office to make a complaint about something happening in a school, the administrator who answers the phone will instruct the caller to raise the issue with a lower level official, such as a teacher or principal at the school.

465.   Those lower officials rarely, if ever, elevate the issue back up to the Board.

466.   As a result, the Board is unable to learn of violations of students' and parents' rights occurring in its schools.

467.   For instance, Defendants Mastoloni and Kessler violated the educational privacy rights of many of their students, and by extension their parents, by allowing E.D. to grade the students' tests.

468.   The fact that E.D. was grading student tests was known to at least one assistant vice-principal and the head of the Spanish Department.

469.   Yet, neither of them informed the Board of the violation.

470.   Had a parent tried to inform the Board, an administrator working for the Board would have instructed the parent to report it to the head of the Spanish Department – who already knew.

471.   At that point, no further action would be taken by the Board.

472.   By utilizing this approach, the Board prevents any substantive information about violations of students' or parents' rights from personally reaching the Board members.

473.   Thus, when a lawsuit arises alleging a violation of a student's or parent's rights, the Board asserts that it cannot be held liable, because it was unaware of the problem.

474.   Yet, the fact that the Board was unaware of the problem is a direct and proximate result of the Board's policy or custom of deliberate indifference towards any violation of a student's or parent's rights, including their constitutional rights.

   **D.   For Those Cases Where Complaints About Abusive Employees Do Reach Board Members, the Board Has Adopted a Policy or Custom of Covering Up the Problem, Protecting the Abusers, and Retaliating Against the Complaining Student or Parent**

475.   For those cases, where violations of students' or parents' rights do reach the Board members, the Board's policy or custom has been to respond with sociopathic behavior, or to protect other school officials who are engaging in sociopathic behavior.

476.   On information and belief, the Board has received complaints from parents that school officials are publicly disparaging them or their children in retaliation for making complaints against abusive employees.

477.   On information and belief, the Board has received complaints from parents that school officials are making false allegations against them or their children in retaliation for making complaints about abusive employees.

478.   On information and belief, the Board has received complaints from parents that school officials have threatened to publicly reveal disparaging information about their children if they do not back down from their complaints against abusive employees.

479.   On information and belief, the Board has been copied on messages from school officials to parents in which the school official falsely tells the parent that the parent is not entitled to see the disciplinary records of school employees.

480.   On information and belief, the Board has received complaints from parents that its investigations of abusive employees are not fact-based or fact-checked.

481.   On information and belief, the Board has received complaints from parents that investigations into abusive employees have been run by the perpetrator, or other conflicted individuals, rather than by an independent investigator.

482.   On information and belief, the Board has received complaints from parents that they have been left in the dark with respect to investigations of abusive employees, even when it is the parents' own child who was the victim of the abuse.

483. On information and belief, the Board has received complaints from parents that school employees have closed investigations into abusive employees without ever interviewing the alleged victim, or other key witnesses.

484. On information and belief, the Board has received complaints from parents that abusive employees have not been removed from their jobs, and have been given opportunities to abuse more victims.

485. On information and belief, in each case where the Board has received such complaints, the Board has either not responded, responded superficially, or responded by siding with and defending the abusive employees or the abusive actions.

486. Such conduct by the Board is designed to discourage other families with legitimate complaints about the school or its employees from coming forward.

487. The Board's conduct has directly and proximately caused a whole host of instances of employee abuse to occur.

488. For instance, in one incident, a coach who was verbally abusive towards students was reported to the Board, and not disciplined.

489. On yet another occasion, the Board gave a male teacher several "one more chances" after inappropriately touching female students over the years.

490. Jane Doe has personally experienced the Board's sociopathic behavior on multiple occasions.

491. In or around 2004, Jane Doe wrote an article discussing the school budget.

492. That article was published in a local newspaper.

493. The Superintendent retaliated against Jane Doe by contacting the president of the Parent-Teacher Organization and demanding that Jane Doe no longer be permitted to act as the school board liaison for the Parent-Teacher Organization.

494. Then, in the 2005-2006 school year, Jane Doe had complaints about J.D.'s third-grade teacher.

495. The teacher had taken numerous pictures of children in his class and published them on his school-sanctioned web page, without the parents' permission.

496. Jane Doe brought her complaints to the Superintendent.

497. Instead of the Superintendent immediately requiring the teacher to take the pictures off of his website, the Superintendent dragged his feet.

498.   Jane Doe held many meetings with the Superintendent over a period of months.

499.   Even though the website was controlled by the Board, and even though it involved an issue of the children's security, it took month after month of complaining to the Superintendent before the pictures were finally taken down.

500.   Jane Doe had another interaction with the Board when E.D. was in eighth grade.

501.   E.D. was being subjected to terrible bullying (which is what made her vulnerable to the predatory indoctrination by Defendants Mastoloni, Kessler, Esposito, and Sullivan a year later).

502.   Jane Doe communicated with the Superintendent on numerous occasions to get the bullying to stop.

503.   The Superintendent and the Board were nonresponsive to Jane Doe's pleas for help.

504.   It was not until Jane Doe asked a police officer friend to come into school to protect E.D. that the Superintendent began to take the situation seriously, and only then did the bullying finally stop.

505.   Each of the instances described herein, and others that are expected to be uncovered in discovery, show that the Board has adopted a policy or custom of adhering to a sociopathic pattern of behavior every time a parent became vocal about an issue pertaining to the school.

506.   The Board's sociopathic pattern of behavior consists of the following:

    a.   the parents request for action or information is ignored or rebuked;

    b.   the situation is downplayed or covered up;

    c.   the proper resolution (i.e. -  disciplining the abusive teacher) is rarely achieved, or superficially achieved; and

    d.   the students and parents who make the complaint are subject to retaliatory intimidation and harassment.

507.   The Board's policy or custom of handling student and parent complaints in this manner indicates that the Board is deliberately indifferent to the rights of students and parents.

508.   Moreover, the Board's policy or custom of deliberate indifference led Defendants Mastoloni, Kessler, Esposito, and Sullivan to believe that they could cross boundaries which, in any other school, would be deemed unacceptable to cross, and that they could do so with impunity.

509.  Thus, the Board's policy or custom of deliberate indifference directly and proximately caused the Plaintiffs' injuries.

510.  Defendant Kessler acknowledged as much in her response to Jane Doe's plea for help on July 13, 2014.

511.  On that day, which was the day after E.D. and L.D. left home for good, Jane Doe sent a Facebook message to Kessler to say she wanted to talk to her regarding E.D.

512.  Several hours later Kessler sent a message to Jane Doe saying that she was sorry if Jane Doe had any kind of a "situation," but as an employee of Avon Public Schools, she did not wish to get involved.

513.  In other words, Kessler cited her position with Avon Public Schools as the reason why she needed to remain deliberately indifferent towards the Doe family's constitutional rights which were being violated by the predatory indoctrination and familial alienation, which was being caused by Avon High School faculty members, including herself.

514.  Kessler's statement indicates that she knew that the Board had a policy or custom of deliberate indifference towards the Doe family's constitutional rights.

515.  Although the Board may assert that Kessler was not telling the truth when she made that statement, on information and belief, the Board has neither terminated nor disciplined Kessler for making that statement, even though the Board has known of that statement since at least May 21, 2014.

      **E.**    **The Board's Policy or Custom of Deliberate Indifference Towards the Constitutional Rights of Students and Parents Is Evident From Its Behavior Since the Filing of This Lawsuit**

          1.    None of the Defendant Faculty Members Have Been Placed On Administrative Leave

516.  On May 21, 2014, the Board learned about the instant lawsuit when it was reported in the news media (without the efforts or cooperation of the Plaintiffs).

517.  Yet, on information and belief, as of the day this First Amended Complaint is being filed, Defendants Mastoloni, Kessler, and Sullivan are all still employed with Avon Public Schools.

518.  Defendant Esposito is no longer employed at Avon Public Schools, but he had already taken another job prior to this lawsuit being filed.

519.   In other words, after being told of all of the abuses committed by Mastoloni, Kessler, and Sullivan, the Board is still willing to let all three of them continue working at Avon High School, where they will have access to more victims.

520.   On information and belief, none of the Defendants have even been placed on administrative leave pending an investigation.

521.   What that shows is that the Board has a policy of not taking allegations of predatory indoctrination and familial alienation seriously.

522.   More specifically, it shows that the Board has a policy of deliberate indifference towards the constitutional rights of students and parents that are violated by faculty members who engage in predatory religious indoctrination and familial alienation.

523.   This policy or custom of deliberate indifference was obviously not created on May 21, 2014, when the Board first learned about this lawsuit.

524.   Rather, such policy or custom had already been place, at all times relevant to this First Amended Complaint.

2.   Defendant Kessler Is Still a Member of the Anti-Bullying Committee

525.   Since the filing of this lawsuit, Defendant Kessler has been permitted to remain on the "Safe School Climate Committee."

526.   This posed a problem for J.D. in May 2014 when she started to receive bullying from her classmates in response to the filing of this lawsuit.

527.   Jane Doe complained about the bullying to the principal.

528.   The principal responded by asking Jane Doe to file a report with the Safe School Climate Committee.

529.   Yet, the Board had not removed Defendant Kessler from the Committee.

530.   That meant that Jane Doe and J.D. would have had to submit the report to one of the perpetrators of J.D.'s abuse.

531.   Because Jane Doe and J.D. were not comfortable with that, they did not file the report.

532.   This is a further indication that the Board has a policy or custom of deliberate indifference towards the constitutional rights of its students and parents.

       3.       The Board Has Engaged In Retaliatory Intimidation Since This Lawsuit Has Been Filed

533.    Since the news coverage of this lawsuit broke, the Superintendent has not publicly expressed any outrage at the behavior of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

534.    Nor has he publicly promised to put a stop to such behavior in the future.

535.    Instead, he has engaged in acts of intimidation to retaliate against the Doe family.

536.    Specifically, on August 1, 2014, the Superintendent tried to intimidate the Plaintiffs by bringing a motion to disqualify the Plaintiffs' attorneys on the grounds that J.D. does not really want to participate in this lawsuit.

537.    Yet, neither the Superintendent nor any employee of Avon Public Schools had ever asked J.D. what she wanted – not even her guidance counselor (who at that time was no longer Defendant Sullivan).

538.    By assuming that J.D. did not really want to participate in a lawsuit that vindicates her constitutional rights, without ever asking her if she wanted to vindicate her constitutional rights, the Superintendent was adhering to a policy or custom of deliberate indifference to the constitutional rights of a student.

539.    Even worse, the Superintendent attempted to support his August 1, 2014 motion with affidavits from E.D. and L.D. which falsely accuse Jane and John of being abusive parents.

540.    The Superintendent was required to report any credible allegations of abuse to the Connecticut Department of Children and Families ("DCF"), if there was a minor, such as J.D., still living in the allegedly abusive household.

541.    Yet, the Superintendent was so doubtful about the veracity of E.D.'s and L.D.'s abuse allegations, that he chose not to report the alleged abuse to DCF.

542.    The fact that the Superintendent would file abuse allegations with a federal court for purposes of gaining a strategic advantage in civil rights litigation, without reporting the abuse to DCF, shows that the Board has a policy or custom of retaliating against those who assert their constitutional rights.

543.    That policy or custom did not start with this lawsuit.

544.    Rather, that policy or custom was in place at all times relevant to this First Amended Complaint.

545.    That policy or custom reflects deliberate indifference towards the constitutional rights of students and parents.

F.    **The Board's Policy or Custom of Deliberate Indifference Caused the Plaintiffs' Injuries**

546.    As a direct and proximate result of the Board's deliberate indifference, Plaintiffs were damaged, in that they experienced severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

547.    As a direct and proximate result of the Board's deliberate indifference, Jane and John were damaged, in that they suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

548.    As a direct and proximate result of the Board's deliberate indifference, J.D. was damaged, in that she suffered the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

549.    Therefore, Defendant Avon Public Schools is liable for all of the violations of the Plaintiffs' federal constitutional and federal statutory rights alleged in this First Amended Complaint, pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

## CLAIMS FOR RELIEF

## CAUSE OF ACTION #1[1]

## DEPRIVATION OF CIVIL RIGHTS
### (42 U.S.C. § 1983)

**(As to Jane and John Against All Defendants
Arising Out of Indoctrination of Three Daughters and Alienation of Two Daughters)**

550.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

551.    The actions and omissions of Defendants, causing Jane's and John's three daughters to be indoctrinated with religion in a public school, and causing two of their daughters to become alienated from them, have deprived Jane and John of their rights which are secured by the First and Fourteenth Amendments to the Constitution of the United States.

---

[1] To the extent that the causes of action in this First Amended Complaint are contradictory, they are pled in the alternative.

A.    **Deprivation of Separation of Church and State Rights Under Establishment Clause**

552.    Jane and John sent their three minor daughters to public school.

553.    Jane and John have the right to require that the public school education provided by the government is secular.

554.    The government has an obligation to provide a public school education that is secular.

555.    Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan abused their positions of authority over Jane's and John's daughters by indoctrinating them with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan while the daughters were minors attending public school.

556.    The religious indoctrination had no secular purpose.

557.    The primary effect of such religious indoctrination was to advance the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

558.    The primary effect of such religious indoctrination was also to inhibit Jane's and John's free exercise of their own religion, since the free exercise of their own religion includes the right to raise their minor children in the religion of their choice.

559.    As a result of the religious indoctrination of Jane's and John's daughters by public school teachers and a public school guidance counselor, the government has become entangled with religion.

560.    The religious indoctrination of students by Defendants Mastoloni, Kessler, Esposito, and Sullivan, who were each acting in their respective capacities as public school teachers and a public school guidance counselor, constitutes a government endorsement of the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

561.    The religious indoctrination of students by Defendants Mastoloni, Kessler, Esposito, and Sullivan, who were each acting in their respective capacities as public school teachers and a public school guidance counselor, has caused and will cause reasonable observers to believe that the government endorses the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

562.    The religious indoctrination of students by public school teachers and a public school guidance counselor is coercive, because students are compelled by law to attend school.

563.    Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated Jane's and John's rights under the Establishment Clause in the First Amendment to the United States Constitution.

**B.**   **Deprivation of Free Exercise Rights and Parental Autonomy Rights Under Free Exercise Clause & Due Process Clause (Hybrid Rights)**

564.   Jane and John have the right to parental autonomy, which includes the right to direct the upbringing of their own minor children.

565.   The right of parental autonomy includes the right to freely exercise their religion by raising their minor children in the religion of their choice.

566.   The right of parental autonomy also includes the right to direct the minor children's education.

567.   These are all fundamental rights.

568.   Jane and John are Catholic, and they raised all of their children as Catholic.

569.   Jane and John sent their three minor daughters to public school to receive a secular education.

570.   Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan abused their positions of authority over the Doe's daughters by indoctrinating each daughter with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan while each daughter was a minor attending public school.

571.   The religious indoctrination of Jane's and John's minor children imposed a substantial burden on Jane's and John's free exercise of religion, because it substantially burdened their right to raise their minor children in the religion of their choice.

572.   The religious indoctrination of their minor children, and the concealment of same, infringed on Jane's and John's fundamental right to parental autonomy.

573.   Defendant Sullivan further infringed on Jane's and John's fundamental right to parental autonomy by attempting to lure J.D. into a private meeting with her after Jane and John had expressly told Defendant Sullivan that they did not want Defendant Sullivan to have any meetings with J.D. without Jane and John being present.

574.   Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for infringing on Jane's and John's free exercise of religion and fundamental right to parental autonomy.

575.   Defendants Mastoloni, Kessler, Esposito, and Sullivan infringed on Jane's and John's free exercise of religion and fundamental right to parental autonomy without due process of law.

576. Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated Jane's and John's rights under the Free Exercise Clause of the First Amendment to the United States Constitution, and under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### C. Deprivation of Intimate Relationship Rights Under Due Process Clause

577. Jane and John have the right to maintain intimate relationships with their adult daughters free from government interference.

578. This is a fundamental right.

579. Prior to the interference by the Defendants Mastoloni, Kessler, Esposito, and Sullivan, E.D. and L.D. each had a loving relationship with each of their parents.

580. Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan indoctrinated E.D. and L.D. with their belief system.

581. At that time, Defendants Mastoloni, Kessler, Esposito, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where E.D. and L.D. were in attendance.

582. Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over the information that E.D. and L.D. could have access to and the communications that they could participate in.

583. Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over E.D.'s and L.D.'s behaviors, emotions, thoughts, and personalities.

584. Defendants Mastoloni, Kessler, Esposito, and Sullivan used their domination over E.D. and L.D. to plant false memories of parental abuse into their minds, in order to turn them against their parents.

585. In April 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan, acting through E.D. and L.D., successfully indoctrinated J.D. with their belief system.

586. At that time, Defendants Mastoloni, Kessler, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where J.D. was a student in Mastoloni's class.

587. In or around June 2013, Jane and John successfully freed J.D. from the indoctrination.

588. A few weeks later, Defendants Mastoloni, Kessler, Esposito, and Sullivan retaliated against Jane and John for freeing J.D. from the indoctrination.

589.  In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan instructed E.D. and L.D. to terminate their relationships with all of their family members.

590.  In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan orchestrated a scheme to enable E.D. and L.D. to fraudulently obtain housing at Wellesley, by falsely claiming that their family had abused them and that they were homeless.

591.  In or around July 2013, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

592.  On July 12, 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan facilitated the removal of E.D. and L.D. from the Doe household, providing them with food, housing and transportation.

593.  As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between Jane and E.D. was terminated.

594.  As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between Jane and L.D. was terminated.

595.  As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between John and E.D. was terminated.

596.  As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between John and L.D. was terminated.

597.  The termination of those relationships was not incidental to any legitimate government activity.

598.  Rather, the termination of those relationships was the intended goal that Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to achieve.

599.  Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to terminate those relationships at that time to retaliate against Jane and John for causing Defendants Mastoloni, Kessler, Esposito, and Sullivan to lose control over J.D.

600.  Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for interfering with Jane's and John's intimate relationships.

601.  Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for retaliating against Jane and John.

602.  Defendants Mastoloni, Kessler, Esposito, and Sullivan interfered with Jane's and John's intimate relationships without due process of law.

603.   Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated Jane's and John's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### D.   Deprivation of Expressive Association Rights Under First Amendment

604.   Jane and John have the right to maintain intimate relationships with their adult daughters free from government interference.

605.   Jane and John also have the right to freely engage in expressive speech and conduct, which includes the right to freely exercise their religious choices, and to reject the religious choices of others.

606.   Prior to the interference by the Defendants Mastoloni, Kessler, Esposito, and Sullivan, E.D. and L.D. each had a loving relationship with each of their parents.

607.   Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan indoctrinated E.D. and L.D. with their belief system.

608.   At that time, Defendants Mastoloni, Kessler, Esposito, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where E.D. and L.D. were in attendance.

609.   Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over the information that E.D. and L.D. could have access to and the communications that they could participate in.

610.   Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over E.D.'s and L.D.'s behaviors, emotions, thoughts, and personalities.

611.   Defendants Mastoloni, Kessler, Esposito, and Sullivan used their domination over E.D. and L.D. to plant false memories of parental abuse into their minds, in order to turn them against their parents.

612.   In April 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan, acting through E.D. and L.D., successfully indoctrinated J.D. with their belief system.

613.   At that time, Defendants Mastoloni, Kessler, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where J.D. was a student in Mastoloni's class.

614.   In or around June 2013, Jane and John successfully freed J.D. from the indoctrination.

615.   Jane's and John's decision to free J.D. from the indoctrination was a religious choice.

616. Jane and John freed J.D. from the indoctrination by talking with her, interacting with her, and departing religious values to her.

617. Thus, when Jane and John freed J.D. from the indoctrination, they were engaging in expressive conduct, protected by the First Amendment.

618. A few weeks later, Defendants Mastoloni, Kessler, Esposito, and Sullivan retaliated against Jane and John for freeing J.D. from the indoctrination.

619. In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan instructed E.D. and L.D. to terminate their relationships with all of their family members.

620. In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan orchestrated a scheme to enable E.D. and L.D. to fraudulently obtain housing at Wellesley, by falsely claiming that their family had abused them and that they were homeless.

621. In or around July 2013, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

622. On July 12, 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan facilitated the removal of E.D. and L.D. from the Doe household, providing them with food, housing and transportation.

623. As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between Jane and E.D. was terminated.

624. As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between Jane and L.D. was terminated.

625. As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between John and E.D. was terminated.

626. As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between John and L.D. was terminated.

627. The termination of those relationships was not incidental to any legitimate government activity.

628. Rather, the termination of those relationships was the intended goal that Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to achieve.

629. Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to terminate those relationships at that time to retaliate against Jane and John for their expressive conduct,

which caused Defendants Mastoloni, Kessler, Esposito, and Sullivan to lose control over J.D.

630. Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for interfering with Jane's and John's intimate relationships.

631. Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for retaliating against Jane and John for their expressive conduct with J.D.

632. Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated Jane's and John's rights under the First Amendment to the United States Constitution.

### E. Deprivation of Equal Treatment Rights Under Equal Protection Clause

633. Defendants Mastoloni, Kessler, Esposito, and Sullivan treated Jane and John differently than other similarly situated parents by singling out their family – in particular their three daughters - for religious indoctrination.

634. Thus, Jane and John each constitute a "class of one" for equal protection purposes.

635. Defendants Mastoloni, Kessler, Esposito, and Sullivan treated Jane and John differently than other similarly situated parents, without a compelling reason or a rational basis for doing so.

636. Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### F. Deprivation of Rights Under § 1983

637. The deprivation of Jane's and John's rights which are secured by the First and Fourteenth Amendments to the Constitution of the United States, violates 42 U.S.C. § 1983.

638. The Defendants' violations of § 1983 occurred under color of state law. The Defendants, and each of them, exercised power that they possessed by virtue of state law, in that the Defendants are a public school district, public school teachers, and a public school guidance counselor, and their actions were made possible only because they were clothed with the authority of state law.

639. The Defendants' violations of § 1983 directly and proximately caused Jane and John to suffer severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

640. The Defendants' violations of § 1983 directly and proximately caused Jane and John to suffer the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection,

emotional support, and future financial support.

641. The Defendants' violations of § 1983 were committed in a manner that was reckless or callously indifferent to Jane's and John's federally protected constitutional rights, and Jane and John are thus entitled to recover punitive damages, as permitted by law.

642. Defendant Avon Public Schools is liable for this cause of action pursuant to *Monell*.

## CAUSE OF ACTION #2

## DEPRIVATION OF CIVIL RIGHTS
## (42 U.S.C. § 1983)

### (As to J.D. Against All Defendants
### Arising Out of Indoctrination, Harassment, and Alienation of Two Sisters)

643. The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

644. The actions and omissions of Defendants, causing J.D. to be indoctrinated with religion in a public school, to be singled out from her peers for harassment, and to become alienated from her two sisters, have deprived J.D. of her rights which are secured by the First and Fourteenth Amendments to the Constitution of the United States.

### A.   Deprivation of Separation of Church and State Rights Under Establishment Clause

645. J.D. attended public school.

646. J.D. has the right to require that the public school education provided by the government is secular.

647. The government has an obligation to provide a public school education that is secular.

648. Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan abused their positions of authority over J.D. by indoctrinating her with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan in the public school.

649. The religious indoctrination had no secular purpose.

650. The primary effect of such religious indoctrination was to advance the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

651. The primary effect of such religious indoctrination was also to inhibit J.D.'s free exercise of her own religion.

652.   As a result of the religious indoctrination of J.D. by public school teachers and a public school guidance counselor, the government has become entangled with religion.

653.   The religious indoctrination of students by Defendants Mastoloni, Kessler, Esposito, and Sullivan, who were each acting in their respective capacities as public school teachers and a public school guidance counselor, constitutes a government endorsement of the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

654.   The religious indoctrination of students by Defendants Mastoloni, Kessler, Esposito, and Sullivan, who were each acting in their respective capacities as public school teachers and a public school guidance counselor, has caused and will cause reasonable observers to believe that the government endorses the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

655.   The religious indoctrination of students by public school teachers and a public school guidance counselor is coercive, because students are compelled by law to attend school.

656.   Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated the Establishment Clause in the First Amendment to the United States Constitution.

### B.   Deprivation of Free Exercise Rights Under Free Exercise Clause

657.   J.D. is Catholic.

658.   J.D. attended public school to receive a secular education.

659.   Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan abused their positions of authority over J.D. by indoctrinating her with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan in the public school.

660.   The religious indoctrination was deceptive, coercive, and nonconsensual.  In effect, J.D. was converted to a new religion against her will.

661.   The nonconsensual religious indoctrination imposed a substantial burden on J.D.'s free exercise of religion.

662.   Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for indoctrinating students with religion in the public schools.

663.   Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated the Free Exercise Clause of the First Amendment to the United States Constitution.

**C.**     **Deprivation of Intimate Relationship Rights Under Due Process Clause**

664.   J.D. has the right to maintain intimate relationships with her adult sisters free from government interference.

665.   This is a fundamental right.

666.   Prior to the interference by the Defendants Mastoloni, Kessler, Esposito, and Sullivan, E.D. and L.D. each had a loving relationship with J.D.

667.   Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan indoctrinated E.D. and L.D. with their belief system.

668.   At that time, Defendants Mastoloni, Kessler, Esposito, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where E.D. and L.D. were in attendance.

669.   Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over the information that E.D. and L.D. could have access to and the communications that they could participate in.

670.   Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over E.D.'s and L.D.'s behaviors, emotions, thoughts, and personalities.

671.   Defendants Mastoloni, Kessler, Esposito, and Sullivan used their domination over E.D. and L.D. to plant false memories of familial abuse into their minds, in order to turn them against their family.

672.   In April 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan, acting through E.D. and L.D., successfully indoctrinated J.D. with their belief system.

673.   At that time, Defendants Mastoloni, Kessler, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where J.D. was a student in Mastoloni's class.

674.   In or around June 2013, with the help of her parents, J.D. successfully freed herself from the indoctrination.

675.   A few weeks later, Defendants Mastoloni, Kessler, Esposito, and Sullivan retaliated against J.D. for freeing herself from the indoctrination.

676.   In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan instructed E.D. and L.D. to terminate their relationships with all of their family members.

677.   In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan orchestrated a scheme to enable E.D. and L.D. to fraudulently obtain housing at

51

Wellesley, by falsely claiming that their family had abused them and that they were homeless.

678.   In or around July 2013, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

679.   On July 12, 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan facilitated the removal of E.D. and L.D. from the Doe household, providing them with food, housing and transportation.

680.   As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between J.D. and E.D. was terminated.

681.   As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between J.D. and L.D. was terminated.

682.   The termination of those relationships was not incidental to any legitimate government activity.

683.   Rather, the termination of those relationships was the intended goal that Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to achieve.

684.   Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to terminate those relationships at that time to retaliate against J.D. for leaving the control of Defendants Mastoloni, Kessler, Esposito, and Sullivan.

685.   Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for interfering with J.D.'s intimate relationships.

686.   Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for retaliating against J.D.

687.   Defendants Mastoloni, Kessler, Esposito, and Sullivan interfered with J.D.'s intimate relationships without due process of law.

688.   Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated J.D.'s rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**D.   Deprivation of Expressive Association Rights Under First Amendment**

689.   J.D. has the right to maintain intimate relationships with her adult sisters free from government interference.

690.    J.D. also has the right to freely engage in expressive speech and conduct, which includes the right to freely exercise her religious choices, and to reject the religious choices of others.

691.    Prior to the interference by the Defendants Mastoloni, Kessler, Esposito, and Sullivan, E.D. and L.D. each had a loving relationship with J.D.

692.    Nevertheless, Defendants Mastoloni, Kessler, Esposito, and Sullivan indoctrinated E.D. and L.D. with their belief system.

693.    At that time, Defendants Mastoloni, Kessler, Esposito, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where E.D. and L.D. were in attendance.

694.    Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over the information that E.D. and L.D. could have access to and the communications that they could participate in.

695.    Defendants Mastoloni, Kessler, Esposito, and Sullivan assumed total or near-total control over E.D.'s and L.D.'s behaviors, emotions, thoughts, and personalities.

696.    Defendants Mastoloni, Kessler, Esposito, and Sullivan used their domination over E.D. and L.D. to plant false memories of familial abuse into their minds, in order to turn them against their family.

697.    In April 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan, acting through E.D. and L.D., successfully indoctrinated J.D. with their belief system.

698.    At that time, Defendants Mastoloni, Kessler, and Sullivan were all acting under color of law and within the scope of their employment with Avon High School, where J.D. was a student in Mastoloni's class.

699.    In or around June 2013, with the help of her parents, J.D. successfully freed herself from the indoctrination.

700.    J.D.'s decision to free herself from the indoctrination was a religious choice.

701.    J.D. freed herself from the indoctrination by talking with Jane and John, interacting with them, and engaging in their religious values.

702.    Thus, when J.D. freed herself from the indoctrination, she was engaging in expressive conduct, protected by the First Amendment.

703.    A few weeks later, Defendants Mastoloni, Kessler, Esposito, and Sullivan retaliated against J.D. for freeing herself from the indoctrination.

704.   In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan instructed E.D. and L.D. to terminate their relationships with all of their family members.

705.   In or around July 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan orchestrated a scheme to enable E.D. and L.D. to fraudulently obtain housing at Wellesley, by falsely claiming that their family had abused them and that they were homeless.

706.   In or around July 2013, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

707.   On July 12, 2013, Defendants Mastoloni, Kessler, Esposito, and Sullivan facilitated the removal of E.D. and L.D. from the Doe household, providing them with food, housing and transportation.

708.   As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between J.D. and E.D. was terminated.

709.   As a direct and proximate result of the actions of Defendants Mastoloni, Kessler, Esposito, and Sullivan, the intimate relationship between J.D. and L.D. was terminated.

710.   The termination of those relationships was not incidental to any legitimate government activity.

711.   Rather, the termination of those relationships was the intended goal that Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to achieve.

712.   Defendants Mastoloni, Kessler, Esposito, and Sullivan sought to terminate those relationships at that time to retaliate against J.D. for her expressive conduct, which caused Defendants Mastoloni, Kessler, Esposito, and Sullivan to lose control over her.

713.   Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for interfering with J.D.'s intimate relationships.

714.   Defendants Mastoloni, Kessler, Esposito, and Sullivan had no compelling reason or rational basis for retaliating against J.D. for her expressive conduct with her parents.

715.   Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated J.D.'s rights under the First Amendment to the United States Constitution.

### E.   Deprivation of Equal Treatment Rights Under Equal Protection Clause

716.   Defendants Mastoloni, Kessler, Esposito, and Sullivan treated J.D. differently than other similarly situated students by singling her out for religious indoctrination, and subsequently indoctrinating her.

717.    Defendants Mastoloni, Kessler, Esposito, and Sullivan also treated J.D. differently than other similarly situated students by singling her out for harassment.

718.    For instance, Defendant Mastoloni singled out J.D. for harassment by:

    1)    making her sing in front of her class;

    2)    pulling her out of the room, in front of her class, to chastise her for getting a "C," even though many other students also got the same grade; and

    3)    disclosing J.D.'s classwork and grades to E.D., her sister.

719.    Defendants Kessler and Sullivan singled out J.D. for harassment by making snide comments and jokes at J.D.'s expense, in public view of J.D.'s classmates.

720.    Defendant Sullivan singled out J.D. for harassment by:

    1)    pressuring J.D. to attend an in-person meeting with Defendant Sullivan to address an issue that did not require an in-person meeting;

    2)    pressuring J.D. to take a Spanish class with Defendant Kessler knowing that Defendant Kessler had targeted J.D. and her older sisters for predatory indoctrination;

    3)    attempting to lure J.D. into a private meeting after her parents had told Defendant Sullivan that they did not want Defendant Sullivan to meet with J.D. outside the presence of her parents; and

    4)    failing to meet with J.D. for college planning as required; and

    5)    failing to cooperate with J.D.'s need for a guidance counselor recommendation to apply to college.

721.    Thus, J.D. constitutes a "class of one" for equal protection purposes.

722.    Defendants Mastoloni, Kessler, Esposito, and Sullivan treated J.D. differently than other similarly situated students, without a compelling reason or a rational basis for doing so.

723.    Therefore, Defendants Mastoloni, Kessler, Esposito, and Sullivan violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### F.    Deprivation of Rights Under § 1983

724.    The deprivation of J.D.'s rights which are secured by the First and Fourteenth Amendments to the Constitution of the United States, violates 42 U.S.C. § 1983.

725.   The Defendants' violations of § 1983 occurred under color of state law. The Defendants, and each of them, exercised power that they possessed by virtue of state law, in that the Defendants are a public school district, public school teachers, and a public school guidance counselor, and their actions were made possible only because they were clothed with the authority of state law.

726.   The Defendants' violations of § 1983 directly and proximately caused J.D. to suffer severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

727.   The Defendants' violations of § 1983 directly and proximately caused J.D. to suffer the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

728.   The Defendants' violations of § 1983 were committed in a manner that was reckless or callously indifferent to J.D.'s federally protected constitutional and statutory rights, and J.D. is thus entitled to recover punitive damages, as permitted by law.

729.   Defendant Avon Public Schools is liable for this cause of action pursuant to *Monell*.

## CAUSE OF ACTION #3

## VIOLATION OF STATE RELIGIOUS FREEDOM RESTORATION ACT
### (Conn. Gen. Stat. § 52-571b)

### (As to Jane and John Against All Defendants
### Arising Out of Indoctrination of Three Daughters)

730.   The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

731.   Jane and John are Catholic, and they raised all of their children as Catholic.

732.   Jane and John sent their three daughters to public school to receive a secular education.

733.   Nevertheless, Defendants abused their positions of authority over the Doe's daughters by indoctrinating them with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan in the public school.

734.   The religious indoctrination of their children imposed a substantial burden on Jane's and John's free exercise of religion, since the free exercise of their religion includes the right to raise their children in the religion of their choice.

735.   The Defendants had no compelling governmental interest for indoctrinating students with religion in the public schools.

736.   Therefore, the Defendants violated the Connecticut Religious Freedom Restoration Act (Conn. Gen. Stat. § 52-571b).

737.   The deprivation of Jane's and John's rights under the Connecticut Religious Freedom Restoration Act directly and proximately caused Jane and John to suffer severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

738.   The deprivation of Jane's and John's rights under the Connecticut Religious Freedom Restoration Act directly and proximately caused Jane and John to suffer the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

739.   The deprivation of Jane's and John's rights under the Connecticut Religious Freedom Restoration Act evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #4

## VIOLATION OF STATE RELIGIOUS FREEDOM RESTORATION ACT
### (Conn. Gen. Stat. § 52-571b)

### (As to J.D. Against All Defendants
### Arising Out of Indoctrination)

740.   The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

741.   J.D. is Catholic.

742.   J.D. attended public school to receive a secular education.

743.   Nevertheless, Defendants abused their positions of authority over J.D. by indoctrinating her with the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan in the public school.

744.   The religious indoctrination was deceptive, coercive, and nonconsensual.  In effect, J.D. was converted to a new religion against her will.

745.   The nonconsensual religious indoctrination imposed a substantial burden on J.D.'s free exercise of religion.

746.   The Defendants had no compelling governmental interest for indoctrinating students with religion in the public schools.

747.   Therefore, the Defendants violated the Connecticut Religious Freedom Restoration Act (Conn. Gen. Stat. § 52-571b).

748.   The deprivation of J.D.'s rights under the Connecticut Religious Freedom Restoration Act directly and proximately caused J.D. to suffer severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

749.   The deprivation of J.D.'s rights under the Connecticut Religious Freedom Restoration Act directly and proximately caused J.D. to suffer the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

750.   The deprivation of J.D.'s rights under the Connecticut Religious Freedom Restoration Act evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #5

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (As to Jane, John, and J.D.
### Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)

751.   The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

752.   Taken together, the actions and omissions of the Defendants, as alleged throughout this First Amended Complaint, constitute a continuing course of extreme and outrageous conduct.

753.   The Defendants' conduct was so extreme and outrageous so as to exceed all bounds of conduct usually tolerated in a civilized community.

754.   The Defendants engaged in this extreme and outrageous conduct with the intention of inflicting emotional distress in the Plaintiffs.

755.   Alternatively, the Defendants knew or should have known that the Plaintiffs' emotional distress was a likely result of their extreme and outrageous conduct.

756.   As a direct and proximate result of the Defendants' extreme and outrageous conduct, the Plaintiffs suffered severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

757.   As a direct and proximate result of the Defendants' extreme and outrageous conduct, Jane and John have suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

758.   As a direct and proximate result of the Defendants' extreme and outrageous conduct, J.D. suffered the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

759.   The Defendants' extreme and outrageous conduct was neither justified nor privileged.

760.   The Plaintiffs did not knowingly consent to the Defendants' extreme and outrageous conduct.

761.   The extreme and outrageous conduct committed by the Defendants evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #6

## DEFAMATION

**(As to Jane and John
Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)**

762.   The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim and at length.

763.   The Defendants have made or published statements about the Plaintiffs that are false, defamatory, and damaging to their reputations and character.

764.   Those statements have been heard or read by other members of the Avon community, including by Jane's and John's daughters, E.D. and L.D.

765.   The specific time, place, and manner in which the statements were made or published, and the specific content of the statements, are presently unknown to the Plaintiffs.

766.   Nevertheless, on information and belief, the Defendants have stated that Jane and John are abusive towards their children.

767.   The Defendants have also stated that Jane and John are unsupportive of their children's individual interests and career goals, including that Jane and John are unsupportive of J.D.'s passion for music.

768.   In or around July 2013, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

769.   At all times when the alleged defamation occurred, the Plaintiffs were private figures.

770.   The alleged defamation related only to the actions and character of the private Plaintiffs, and did not relate to a matter of legitimate public concern.

771.   The Defendants made the defamatory statements with actual knowledge of, or reckless disregard for, the falsity of the statements.

772.   The Defendants made the statements with improper and unjustifiable motives. Specifically, the Defendants made the statements in order to intimidate the Plaintiffs and retaliate against them for their resistance to the efforts of Defendants Mastoloni, Kessler, Esposito, and Sullivan to indoctrinate the Doe children with their religion.

773.   The defamatory statements were not privileged.

774.   As a direct and proximate result of the defamation, Jane and John have suffered severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

775.   As a direct and proximate result of the defamation, Jane and John have suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

776.   As a direct and proximate result of the defamation, Jane's and John's reputations have been damaged.

777.   The defamation committed by the Defendants evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #7

## DEFAMATION BY INNUENDO

### (As to Jane and John
### Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)

778.   The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim and at length.

779.   The Defendants have made or published statements about the Plaintiffs that contain false suggestions, impressions and innuendos, and which are defamatory, and damaging to their reputations and character.

780.   Those statements have been heard or read by other members of the Avon community, including by Jane's and John's daughters, E.D. and L.D.

781.   The specific time, place, and manner in which the statements were made or published, and the specific content of the statements, are presently unknown to the Plaintiffs.

782.   Nevertheless, on information and belief, the Defendants have implied that Jane and John are abusive towards their children.

783.   The Defendants have also implied that Jane and John are unsupportive of their children's individual interests and career goals, including that Jane and John are unsupportive of J.D.'s passion for music.

784.   In or around July 2013, Defendant Esposito sent a written communication to Wellesley defaming Jane and John, falsely accusing them of being abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

785.   At all times when the alleged defamation occurred, the Plaintiffs were private figures.

786.   The alleged defamation related only to the actions and character of the private Plaintiffs, and did not relate to a matter of legitimate public concern.

787.   The Defendants made the defamatory statements with actual knowledge of, or reckless disregard for, the falsity of the statements.

788.   The Defendants made the statements with improper and unjustifiable motives. Specifically, the Defendants made the statements in order to intimidate the Plaintiffs and retaliate against them for their resistance to the efforts of Defendants Mastoloni, Kessler, Esposito, and Sullivan to indoctrinate the Doe children with their religion.

789.   The defamatory statements were not privileged.

790.    As a direct and proximate result of the defamation, Jane and John have suffered severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

791.    As a direct and proximate result of the defamation, Jane and John have suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

792.    As a direct and proximate result of the defamation, Jane's and John's reputations have been damaged.

793.    The defamation committed by the Defendants evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #8

## INVASION OF PRIVACY / FALSE LIGHT

**(As to Jane and John
Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)**

794.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

795.    The Defendants have made or published statements about the Plaintiffs that portray them in a false light.

796.    Those statements have been heard or read by other members of the Avon community, including by Jane's and John's daughters, E.D. and L.D.

797.    The specific time, place, and manner in which the statements were made or published, and the specific content of the statements, are presently unknown to the Plaintiffs.

798.    Nevertheless, on information and belief, the Defendants have portrayed Jane and John as abusive towards their children.

799.    The Defendants have also portrayed Jane and John as unsupportive of their children's individual interests and career goals, including a portrayal of Jane and John as unsupportive of J.D.'s passion for music.

800.    In or around July 2013, Defendant Esposito sent a written communication to Wellesley falsely portraying Jane and John as abusive towards E.D. and L.D., and falsely claiming that E.D. and L.D. were homeless.

801.    The false light in which the Plaintiffs were placed as a result of such statements would be highly offensive to a reasonable person.

802.    At all times when the alleged false light statements occurred, the Plaintiffs were private figures.

803.    The alleged false light statements related only to the actions and character of the private Plaintiffs, and did not relate to a matter of legitimate public concern.

804.    The Defendants made the false light statements with actual knowledge of, or reckless disregard for, the falsity of the statements and the false light in which the Plaintiffs would be placed.

805.    The Defendants made the false light statements with improper and unjustifiable motives. Specifically, the Defendants made the statements in order to intimidate the Plaintiffs and retaliate against them for their resistance to the efforts of Defendants Mastoloni, Kessler, Esposito, and Sullivan to indoctrinate the Doe children with their religion.

806.    The false light statements were not privileged.

807.    Therefore, the Defendants have invaded the Plaintiffs' privacy.

808.    As a direct and proximate result of the Defendants' invasion of Jane's and John's privacy, Jane and John have suffered severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

809.    As a direct and proximate result of the Defendants' invasion of Jane's and John's privacy, Jane and John have suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

810.    As a direct and proximate result of the Defendants' invasion of Jane's and John's privacy, Jane's and John's reputations have been damaged.

811.    The invasion of privacy committed by the Defendants evidences a reckless indifference to Jane's and John's rights, or an intentional and wanton violation of those rights, and Jane and John are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #9

## INVASION OF PRIVACY / INTRUSION UPON SECLUSION

**(As to Jane, John, and J.D.**
**Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)**

812.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

813.    Defendants Mastoloni, Kessler, Esposito, and Sullivan intentionally intruded upon the seclusion and private affairs of Jane, John, and J.D. by inquiring into personal and intimate details of the Doe's family life, including the details of their problems with work and illness.

814.    Defendants Mastoloni and Kessler intentionally intruded upon the seclusion of Jane, John, and J.D. by repeatedly trying to get invitations to come over for dinner, and then barging into the Doe family home without being invited in, and intruding on the kids while they were in pajamas.

815.    On a separate occasion, Defendant Esposito intentionally intruded upon the seclusion of Jane, John, and J.D. by barging into the Doe family home without being invited in.

816.    Defendant Mastoloni intruded upon the seclusion of J.D. by disclosing her written class work and grades to E.D., causing her to be confronted by E.D. about her class work and grades.

817.    Each of those intrusions would be highly offensive to a reasonable person.

818.    Therefore, the Defendants have invaded the Plaintiffs' privacy.

819.    As a direct and proximate result of the Defendants' invasion of the Plaintiffs' privacy, the Plaintiffs were damaged, in that they experienced severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

820.    As a direct and proximate result of the Defendants' invasion of Jane's and John's privacy, Jane and John have suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

821.    As a direct and proximate result of the Defendants' invasion of J.D.'s privacy, J.D. has suffered the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional

support.

822. The invasion of privacy committed by the Defendants evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #10

## INVASION OF PRIVACY / PUBLIC DISCLOSURE OF PRIVATE FACTS

### (As to J.D.
### Against Defendant Mastoloni)

823. The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

824. Defendant Mastoloni disclosed private facts about J.D.'s education to a person who was not privileged to receive such disclosures, when she disclosed J.D.'s written class work and grades to E.D.

825. Such disclosures would be highly offensive to a reasonable person.

826. The disclosed information was not of legitimate concern to anyone other than J.D. and her parents, and was not of legitimate concern to E.D.

827. The disclosed information had not previously been disclosed prior to Defendant Mastoloni's disclosure of the information.

828. Therefore, Defendant Mastoloni has invaded J.D.'s privacy.

829. As a direct and proximate result of Defendant Mastoloni's invasion of J.D.'s privacy, J.D. was damaged, in that she experienced severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

830. As a direct and proximate result of Defendant Mastoloni's invasion of J.D.'s privacy, J.D. suffered the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

831. The invasion of privacy committed by Defendant Mastoloni evidences a reckless indifference to J.D.'s rights, or an intentional and wanton violation of those rights, and J.D. is thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #11

## NEGLIGENCE

**(As to Jane, John, and J.D.**
**Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)**

832.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

833.    The Defendants owed a duty of care to Jane and John because Jane and John entrusted their minor children to the Defendants' care and the Defendants were acting *in loco parentis* with respect to the minor children.

834.    The Defendants owed a duty of care to J.D. because she was a minor child in the care of the Defendants and the Defendants were acting *in loco parentis* with respect to J.D.

835.    The Defendants breached their duties of care to the Plaintiffs by:

1)    indoctrinating E.D., L.D., and J.D. into the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan;

2)    harassing J.D. and retaliating against her after she rejected the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan;

3)    planting false memories of abuse in the minds of E.D. and L.D.;

4)    alienating E.D. and L.D. from Jane, John and J.D.;

5)    concealing their activities from Jane and John; and

6)    undertaking such other actions and omissions as are not yet known to Plaintiffs.

836.    As a direct and proximate result of the Defendants' breaches of their duties of care, the Plaintiffs were damaged, in that they experienced severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

837.    As a direct and proximate result of the Defendants' breaches of their duties of care, Jane and John were damaged, in that they suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

838.    As a direct and proximate result of the Defendants' breaches of their duties of care, J.D. was damaged, in that she suffered the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

839.    An ordinary person in the Defendants' position, knowing what the Defendants knew or should have known, would have anticipated that their aggressive and non-consensual religious indoctrination of minors entrusted to their care, without parental knowledge or consent, would likely result in harm of the same general nature as the harm that actually occurred to the Plaintiffs.

840.    An ordinary person in the Defendants' position, knowing what the Defendants knew or should have known, would have anticipated that planting false memories of abuse in the minds of two sisters, and then alienating them from their family, would likely result in harm of the same general nature as the harm that actually occurred to the Plaintiffs.

841.    An ordinary person in the Defendants' position, knowing what the Defendants knew or should have known, would have anticipated that their aggressive harassment and retaliation against J.D. would likely result in harm of the same general nature as the harm that actually occurred to J.D.

842.    The Defendants' responsibility for their negligent conduct should extend to the particular consequences and particular Plaintiffs in the instant case, because public policy demands that minors entrusted to the care of a public school not be subjected to non-consensual, non-disclosed religious indoctrination, harassment, or retaliation, or any other form of abuse.

843.    The Defendants' responsibility for their negligent conduct should extend to the particular consequences and particular Plaintiffs in the instant case, because public policy demands that families who send their children to public schools not be subjected to alienation of their own family members and false allegations of abuse brought about by public school employees.

844.    The negligence committed by the Defendants evidences a reckless indifference to the Plaintiffs' rights, or an intentional and wanton violation of those rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

## CAUSE OF ACTION #12

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**(As to Jane, John, and J.D.
Against Defendants Mastoloni, Kessler, Esposito, and Sullivan)**

845.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if the same were set forth herein verbatim.

846.    The Defendants created, and should have realized they were creating, an unreasonable risk of causing the Plaintiffs' emotional distress by:

    1)      indoctrinating E.D., L.D., and J.D. into the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan;

    2)      harassing J.D. and retaliating against her after she rejected the religion of Defendants Mastoloni, Kessler, Esposito, and Sullivan;

    3)      planting false memories of abuse in the minds of E.D. and L.D.;

    4)      alienating E.D. and L.D. from Jane, John and J.D.;

    5)      concealing their activities from Jane and John; and

    6)      undertaking such other actions and omissions as are not yet known to Plaintiffs.

847.    As a direct and proximate result of the Defendants' conduct, the Plaintiffs suffered severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror.

848.    As a direct and proximate result of the Defendants' conduct, Jane and John were damaged, in that they suffered the loss of their intimate relationships with their two oldest daughters, including the loss of each daughter's society, comfort, and companionship, love and affection, emotional support, and future financial support.

849.    As a direct and proximate result of the Defendants' conduct, J.D. was damaged, in that she suffered the loss of her intimate relationships with her two older sisters, including the loss of each sister's society, comfort, and companionship, love and affection, and emotional support.

850.    The emotional distress suffered by the Plaintiffs was foreseeable and reasonable in light of the Defendants' conduct.

851.    The emotional distress suffered by the Plaintiffs was severe enough that it might have resulted in illness or bodily harm.

852.    The negligence committed by the Defendants evidences a reckless indifference to the Plaintiffs' rights, and the Plaintiffs are thus entitled to recover punitive damages, as permitted by law.

WHEREFORE, the Plaintiff demands judgment be entered for:

1) compensatory damages in an amount to be determined at trial, where the amount takes into account all damages incurred up to the date of the trial, as well as all damages expected to be incurred in the future as a result of the ongoing alienation of E.D. and L.D. from the Plaintiffs;

2) punitive damages in an amount to be determined at trial;

3) filing fees;

4) reasonable costs of suit;

5) reasonable attorney's fees;

6) reasonable pre-and post-judgment interest on all monetary awards; and

7) such other and further relief which this Court may determine to be just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.


Dated: March 14, 2016

/s/ Paul S. Grosswald
**PAUL S. GROSSWALD**
**Bar Number: phv06803**
13 Irving Place, Suite 1
Summit, NJ 07901
Phone: 917-753-7007
Fax: 212-671-1321
pgrosswald@hotmail.com
Attorney for Plaintiffs
**Jane Doe, John Doe, and J.D.**